A05A1448. BHANSALI et al. v. MONCADA.
A05A1449. DAGI et al. v. MONCADA.
(620 SE2d 404)

BLACKBURN, Presiding Judge.

In this medical malpractice action, defendants Dr. Bhansali and Atlanta Ear, Nose & Throat Associates, P.C. in Case No. A05A1448, and Dr. Dagi and Peachtree Neurosurgery, P.C. in Case No. A05A1449 (the defendants in both cases are collectively referred to as the "physicians"), appeal the grant of plaintiff's motion for new trial following a defense verdict rendered by a jury. The physicians argue in both cases that the evidence demanded a verdict in their favor and that therefore the trial court abused its discretion in granting the new trial. Dr. Bhansali and his employer also argue in their appeal that the trial court erred in failing to dismiss the plaintiff's claim which was based on a lack of informed consent. Discerning no reversible error, we affirm.

The undisputed facts show that in 1997, Drs. Bhansali and Dagi performed acoustic neuroma surgery on Paulette Moncada to remove a small tumor near her brain. During the surgery, a tear occurred in Moncada's sigmoid sinus. Following the surgery, Moncada developed complications as a result of the tear, including hydrocephalus, or swelling of the brain. She claims that such caused her permanent brain damage, including short-term memory loss.

Moncada sued Drs. Bhansali and Dagi and their employers for medical malpractice. Following a lengthy trial involving numerous medical experts, the jury quickly rendered a verdict in favor of the defendants, and judgment was entered accordingly. Moncada moved for a new trial on the ground that the verdict was contrary to the evidence. The court granted the motion "on the general grounds pursuant to OCGA § 5-5-20, as this Court finds that the verdict of the jury was contrary to the evidence and the principles of justice." Within a few days, the trial judge recused herself, and the new judge timely granted a certificate of immediate review, leading to these appeals.

1. In both cases, the physicians argue that the trial judge abused her discretion in granting the motion for new trial. The standard of review of the first grant of a new trial by a trial court greatly limits this Court's authority to reverse such holding.

OCGA § 5-5-20 provides: "In any case when the verdict of a jury is found contrary to evidence and the principles of justice and equity, the judge presiding may grant a new trial before another jury." OCGA § 5-5-50 further provides: "The first grant of a new trial shall not be disturbed by an appellate court unless the appellant shows that the judge abused his discretion in granting it and that the law and facts require the verdict notwithstanding the judgment of the presiding judge."

Commenting on the breadth of the discretion allowed a trial judge by these long-established principles, *Holton v. Jones*[1] held:

> [I]n this state the trial judge is vested with the strongest of discretions to review the case and to set the verdict aside if he is not satisfied with it. Indeed the trial judge oftentimes is spoken of as being the thirteenth juror. Until his approval is given the verdict is not binding. This is nothing more than the recognition of a rule of law of this state that the first grant of a new trial to either party is not to be reversed by an appellate court unless the verdict set aside by the trial court was absolutely demanded. This judicial pronouncement has been codified by our legislature in OCGA § 5-5-50.

(Citations omitted.) See *Gibson v. Carter*.[2]

Thus, we will reverse the first grant of a new trial only if the evidence of record absolutely demanded the verdict as rendered. *Holton*, supra at 655-656. See, e.g., *Builders Transport v. Hall*.[3] In making this determination, we construe the evidence, together with all reasonable deductions and inferences therefrom, most strongly in favor of the *losing* party. *Pelham &c. R. Co. v. Walker*.[4] This is distinguished from our review of the *denial* of a new trial, when we construe the evidence in favor of the *winning* party to determine if any evidence supported the verdict. See, e.g., *Quay v. Heritage Financial*.[5]

Here, the physicians contend that the testimony of Moncada's expert (Dr. Segal) did not establish either that they were negligent or that their negligence proximately caused Moncada's damages. With citation to persuasive evidence in the record, they argue:

---

[1] *Holton v. Jones*, 174 Ga. App. 654, 655-656 (331 SE2d 26) (1985).
[2] *Gibson v. Carter*, 248 Ga. App. 280, 281 (1) (545 SE2d 698) (2001).
[3] *Builders Transport v. Hall*, 191 Ga. App. 889, 890-891 (1) (383 SE2d 341) (1989).
[4] *Pelham &c. R. Co. v. Walker*, 24 Ga. App. 530 (2) (101 SE 715) (1919).
[5] *Quay v. Heritage Financial*, 274 Ga. App. 358, 362 (4) (617 SE2d 618) (2005).

There was significant testimony before the jury that the Appellants met the applicable standard of care in advising Appellee of the three (3) treatment options for her acoustic neuroma — surgery, gamma knife and observation; that Appellee understood her three (3) treatment options and the risks and benefits associated with each option; that Appellants Dr. Bhansali and Dr. Dagi performed surgery with the full and informed consent of the Appellee; that the overwhelming medical literature and expert testimony at trial fully supported the appropriateness of the Appellants' treatment and care of Appellee; that Appellee's purported trial expert was not qualified to provide testimony against Appellants on the standard of care, causation or damages issues in the case, and that he impeached himself into ill-repute with the jury who were entitled to completely disregard his testimony; and that the evidence overwhelmingly supported the jury's unanimous verdict in favor of the Appellants.

It is indeed true that substantial testimony supported each and every one of the arguments made by the physicians above. It is also true, as further argued by the physicians, that the trial judge's post-trial action in sua sponte recusing herself immediately following her grant of the new trial raises unanswered questions and concerns. And we sympathize with the physicians' plea not to let a lengthy and detailed jury trial, in which they presented compelling evidence that resulted in a unanimous jury verdict in their favor, go for naught.

Nevertheless, we are constrained by the scope of our review to consider only whether Moncada presented some evidence that could have supported a jury verdict in her favor. If that evidence was indeed presented, then we do not have the power — regardless of how differently we might have handled the motion for new trial — to disturb the trial judge's exercise of her strongest discretion as the "thirteenth juror" to review the case and to set the verdict aside if she was not satisfied with it. See *Thomas v. Wiley*.[6]

We focus on the fact issues that the physicians challenge as lacking evidentiary support — namely, that Moncada failed to present qualified expert testimony that demonstrated they deviated from the recognized and accepted standard of medical care prevalent in the general professional community for treating a patient with the signs and symptoms exhibited by Moncada, and that such negligence

---

[6] *Thomas v. Wiley*, 240 Ga. App. 135, 137 (3) (552 SE2d 714) (1999).

proximately caused Moncada's injuries. See *Smith v. Luckett*[7] (such expert testimony is required in a medical malpractice action). Moncada, however, presented some evidence on these issues.

(a) *Qualifications.* Moncada presented the testimony of Dr. Segal, a board-certified neurosurgeon who had previously performed approximately 15 acoustic neuroma surgeries. Familiar with the standard of care ordinarily exercised by the medical profession in Georgia in 1997 in this medical procedure, he gave his professional opinion about the physicians' deviations from that standard of care and about the consequences thereof within a reasonable degree of medical probability.

(b) *Acts of negligence.* Dr. Segal testified that the physicians committed at least four acts of negligence.

(i) *Misleading brochure.* Opining that a physician should never mislead a patient, Dr. Segal reviewed a brochure that Dr. Bhansali had given to Moncada about her options. This outdated brochure, obtained by Dr. Bhansali during his fellowship six years earlier, misinformed Moncada that surgical removal was the only known treatment for acoustic neuroma. It failed to reference the available options of observation and gamma knife radiation, and according to Dr. Segal, exaggerated the risks of no surgery. Dr. Segal opined that giving this brochure to Moncada was misleading and constituted a deviation from the proper standard of medical care.

(ii) *Surgery should not have been recommended or performed.* Dr. Segal noted that Moncada's acoustic neuroma was very small in that it was only four millimeters; thus, she was not facing a life-threatening situation. It was so small that at first Dr. Dagi was not quite sure it was a tumor. Such small neuromas usually have a slow growth rate and many do not increase in size at all. At the time the neuroma was diagnosed, Moncada was only experiencing some hearing loss in her right ear, and had only a little dizziness and imbalance. Dr. Bhansali estimated that there was only a 25 percent chance of saving Moncada's hearing through any removal by surgery.

Based on these facts, Dr. Segal opined that the surgery was unnecessary, that the surgery exposed Moncada to unnecessary risks, and that the costs and risks associated with the surgery outweighed any potential benefits. Accordingly, he concluded as follows:

Q. In your opinion, was it a deviation from the proper standard of care that applied at that time as practiced by the

---

[7] *Smith v. Luckett*, 155 Ga. App. 640, 641 (3) (271 SE2d 891) (1980).

medical profession generally under the same or similar circumstances to have recommended that surgery?

A. Yes.

* * *

Q. If you assume that Dr. Bhansali thought there was only a 10 to 25 percent chance of saving Mrs. Moncada's hearing, in your opinion was it a deviation from the standard of care for him to have performed the surgery he performed at the time in question?

A. Yes, because I'm not sure what else he would be trying to accomplish.

* * *

Q. Do you have an opinion as to whether or not the performance of this surgery by Dr. Dagi and by Dr. Bhansali constituted a deviation from the standard of care that applied at the time in light of the risks of the surgery versus the benefits to the patient?

A. Looking at the cost-benefit ratio, it's my opinion it was a deviation from the standard of care to perform this surgery.

(iii) *Continuing with surgery after sigmoid sinus tear.* Once there was a tear in the sigmoid sinus, Moncada lost a lot of blood. Dr. Segal opined that continuing with the surgery at that point greatly increased the risk of hydrocephalus and that therefore the surgery should have been stopped at that point to allow the sigmoid sinus to heal, to be followed months later (if at all) by another surgery to remove the neuroma. He concluded:

Q. In your opinion, going forward with surgery after the tear of sigmoid sinus and the blood loss, did that constitute a deviation from the standard of care?

A. Yes.

Q. By both Dr. Dagi and Dr. Bhansali?

A. Yes.

(iv) *Delayed insertion of ventricular drain.* Dr. Segal noted that the day after surgery, the physicians irrationally delayed several hours before inserting a ventricular drain to relieve the detected

swelling. He testified that waiting until the evening of the day following surgery to insert the ventricular drain was a deviation from the standard of care.

(c) *Causation.* Dr. Segal testified that these acts of negligence proximately caused Moncada's injuries:

> Q. [I]n your opinion, were the negligent acts that you've given opinions about today concerning the defendants, the cause of the injuries that subsequently were suffered and sustained by Mrs. Moncada including brain damage, memory loss, and any cognitive problems related thereto?
> A. Yes.

Thus, some evidence supported a finding that the physicians' actions were negligent and proximately caused Moncada's damages. The physicians' pointed attacks at trial on that testimony as incredible, unqualified, and inconsistent with the vast majority of medical literature and overwhelming medical opinion were persuasive to the jury; but these same attacks on appeal of the grant of new trial are unavailing. We acknowledge that the attacks appear to render this testimony questionable, but that is not the standard of review on appeal. Because some expert evidence could support a finding of negligence and causation against the physicians, a verdict in the physicians' favor was not absolutely demanded. Accordingly, we are constrained to uphold the first grant of new trial.

2. Dr. Bhansali and his employer argue that the trial court erred in denying their motion to dismiss based on Moncada's untimely filing of an expert affidavit alleging a lack of informed consent. We disagree for the reasons set forth in the trial court's well-written order denying the dismissal (set forth below), which we adopt:

> OCGA § 9-11-9.1 (a) requires that in any action for damages alleging professional malpractice against a professional licensed by the State of Georgia and listed in subsection (f) of this Code section or against any licensed health care facility alleged to be liable based upon the action or inaction of a health care professional licensed by the State of Georgia and listed in subsection (f) of this Code section, the plaintiff shall be required to file with the complaint an affidavit of an expert competent to testify, which affidavit shall set forth specifically at least one negligent act or omission claimed to exist and the factual basis for each such claim.
>
> An affidavit must be filed contemporaneously with the complaint. A plaintiff is not entitled to file an affidavit in

support of a malpractice claim after the complaint has been filed except according to OCGA § 9-11-9.1 (b), which provides that a plaintiff will have an additional forty-five (45) days from the date of filing the complaint to file the requisite expert affidavit when the complaint is filed within ten (10) days of expiration of the statute of limitations.

OCGA § 31-9-6.1 (d) (3) provides that when a plaintiff wishes to raise an allegation of lack of informed consent, "the expert's affidavit required by Code Section 9-11-9.1 shall set forth that the patient suffered an injury which was proximately caused by the surgical or diagnostic procedure and that such injury was a material risk required to be disclosed under this Code section." Id.

Defendants argue that Plaintiffs' Lack of Informed Consent Claim was untimely filed on the basis that Plaintiffs failed to raise the claim in the initial affidavit of Dr. Bussey filed December 17, 1999 pursuant to OCGA § 9-11-9.1, and therefore should be dismissed.

The Court rejects Defendants' argument in light of the Court of Appeals' previous holdings.

Pursuant to the holding in *Porquez v. Washington,*[8] OCGA § 9-11-9.1 clearly permits a Plaintiff in a medical malpractice case to amend, or substitute a new affidavit, to present additional evidence of deviation from the standard of care, when the expert affidavit as required by § 9-11-9.1 is initially filed with the complaint. Id. at 651.

Defendants in oral arguments asserted that the holding in *Porquez* has been "overruled" by the 1997 Legislative Amendment to OCGA § 9-11-9.1. However, this Court has reached a different conclusion and offers in support of its position the 1998 case of *Phoebe Putney Mem. Hosp. v. Skipper,*[9] in which the Court of Appeals explored the applicability of *Porquez* in light of the 1997 Legislative Amendment.

In *Phoebe*, the Court of Appeals held that the original expert affidavit in a medical malpractice claim could be amended or a new valid affidavit substituted for it. The Supreme Court on writ of certiorari remanded the case back to the Court of Appeals so that it could issue a ruling in line with *Porquez* and *Hewett v. Kalish.*[10] Id. at 536.

---

[8] *Porquez v. Washington,* 268 Ga. 649, 650-652 (1) (492 SE2d 665) (1997).

[9] *Phoebe Putney Mem. Hosp. v. Skipper,* 235 Ga. App. 534 (510 SE2d 101) (1998).

[10] *Hewett v. Kalish,* 264 Ga. 183 (442 SE2d 233) (1994).

The Court of Appeals on remand concluded that the 1997 Amendment according to OCGA § 9-11-9.1 (e) is only designed to preclude amendment under OCGA § 9-11-15, when the Plaintiff completely fails to file an affidavit. Id. at 535.

In the case *sub judice*, pursuant to the Trial Court's Order, and in accordance with OCGA § 9-11-9.1 (b), Plaintiffs on December 17, 1999, filed their first amended complaint adding the expert affidavit of Dr. Bussey approximately forty-five (45) days after the complaint was filed. The affidavit of Dr. Bussey contained at least one allegation that the patient suffered an injury which was proximately caused by the surgical procedure performed on Plaintiff Paulette Moncada.

In filing the expert affidavit on December 17, 2000, Plaintiffs met the minimum requirements in order to sustain a claim for medical malpractice. On February 4, 2000, twenty-eight (28) days after Defendants' Teodoro F. Dagi, M.D. and Peachtree Neurosurgery, P.C., Motion to Dismiss Plaintiffs' Lack of Informed Consent Claim, Plaintiffs filed the second amended complaint supplementing the affidavit of Dr. Bussey adding a claim for Lack of Informed Consent. On March 31, 2000, sixty (60) days before the Court heard oral arguments on Defendants' Motion to Dismiss, Plaintiffs filed their third amended complaint [with] an affidavit from Dr. Korowser, which also stated a claim for Lack of Informed Consent.

The Court finds pursuant to the holdings of *Porquez* and *Phoebe*, that Plaintiffs having timely filed their initial expert affidavit, effectively supplemented the initial affidavit of Dr. Bussey so that the complaint did state a claim for Lack of Informed Consent, supported by affidavits filed February 4, 2000 and March 31, 2000.

\* \* \*

The Court of Appeals has previously held that permitting the Plaintiff to amend the expert affidavit in order to meet the requirements of OCGA § 9-11-9.1 does not defeat the purpose of the statute but helps to insure that the complaint is not frivolous. *Porquez* at 652.

For these reasons, we hold the trial court did not err in denying Dr. Bhansali's motion to dismiss under OCGA § 9-11-9.1.
*Judgments affirmed. Miller and Bernes, JJ., concur.*

DECIDED AUGUST 4, 2005 —
RECONSIDERATION DENIED AUGUST 25, 2005 —

*Insley & Race, Brynda R. Insley, Hall, Booth, Smith & Slover, Timothy H. Bendin, James E. Looper, Downey & Cleveland, William C. Anderson,* for appellants.

*Orr & Edwards, W. Fred Orr II, James G. Edwards II, Cohen, Cooper, Estep & Mudder, Lawrence A. Cooper,* for appellee.