### A09A1644. BONNER v. PETERSON et al.
(687 SE2d 676)

BLACKBURN, Presiding Judge.

In this medical malpractice action, Moswen A. Bonner appeals from the trial court's dismissal of his complaint against Letty Revell Peterson, M.D. and Daniel J. Sheehan, M.D. Bonner asserts that the trial court erred in holding: (1) that he failed to timely assert a medical malpractice claim against Dr. Sheehan; and (2) that Dr. Peterson was entitled to qualified immunity. We agree that the trial court erred in finding that Bonner's complaint and amended expert affidavit failed to assert a timely medical malpractice claim against Dr. Sheehan, and therefore reverse the trial court's dismissal of that claim. We affirm the dismissal of Bonner's claims against Dr. Peterson, however, because we agree with the trial court's conclusion that her status as a state-employed resident physician entitled her to qualified immunity for any liability resulting from her allegedly negligent treatment of Bonner.

We review a trial court's order dismissing a plaintiff's complaint de novo. *Lewis v. Ga. Dept. of Human Resources.*[1] Where the order of dismissal was based upon the plaintiff's failure to state a claim upon which relief could be granted (see OCGA § 9-11-12 (b) (6)), we "will affirm the same only where . . . the allegations of the complaint disclose with certainty that the plaintiff would not be entitled to relief under any state of provable facts asserted therein. . . ." (Punctuation omitted.) *Love v. Morehouse College.*[2] A motion to dismiss asserting sovereign immunity, however, is based upon the trial court's lack of subject matter jurisdiction, rather than the merits of the plaintiff's claim. See *Dept. of Transp. v. Dupree;*[3] OCGA § 9-11-12 (b) (1). The party seeking to benefit from the waiver of sovereign immunity has the burden of proof to establish waiver, and the trial court's pre-trial ruling on factual issues necessary to decide the OCGA § 9-11-12 (b) (1) motion is reviewed on appeal under the any evidence rule. Id.

The record shows that on January 5, 2006, Bonner went to the dermatology clinic at the Medical College of Georgia ("MCG") for treatment of a bump on his chin. He was seen by Dr. Sheehan, an

---

[1] *Lewis v. Ga. Dept. of Human Resources*, 255 Ga. App. 805, 806 (567 SE2d 65) (2002).

[2] *Love v. Morehouse College*, 287 Ga. App. 743, 743 (652 SE2d 624) (2007).

[3] *Dept. of Transp. v. Dupree*, 256 Ga. App. 668, 671 (1) (570 SE2d 1) (2002).

attending physician, and by Dr. Peterson, who was then a third-year resident physician. After examining Bonner, Dr. Sheehan told him the bump was most likely an ingrown hair and that they could attempt to treat the same either with antibiotics or by performing a procedure known as a shave biopsy. Bonner elected the shave biopsy, which involved numbing the site, removing the bump, and sending the same for a laboratory analysis. Dr. Sheehan told Bonner that Dr. Peterson would be performing the procedure, and left the room. Dr. Peterson then requested and received the necessary equipment from the nursing staff and removed the bump from Bonner's face. She then applied a substance she believed to be aluminum chloride to the area. The substance was, in fact, potassium hydrochloride and its application to Bonner's skin resulted in a more severe lesion developing on Bonner's chin.

On January 3, 2008, Bonner filed suit against both physicians, asserting claims against Dr. Peterson for professional negligence, battery, and intentional infliction of emotional distress, and asserting a claim against Dr. Sheehan based upon the theory of respondeat superior. While alleging that Dr. Sheehan was vicariously liable for the negligence of Dr. Peterson, Bonner's complaint also alleged that Dr. Sheehan had failed to properly supervise and train Dr. Peterson. Attached to Bonner's complaint was the expert affidavit required by OCGA § 9-11-9.1, in which the expert opined that Dr. Peterson had failed "to exercise the required degree of skill and care to ensure that the substance that was placed on Mr. Bonner's skin would not harm him." The expert further stated that his affidavit did not contain "a comprehensive list of all deviations from the standard of care" and that he expressly reserved the right "to amend or supplement my opinions in the future after I have seen additional records, deposition testimony, or other evidence."

Dr. Sheehan filed his answer on February 6, 2008 and on April 21, 2008, he moved to dismiss Bonner's claim against him, arguing that (1) because he was not Dr. Peterson's employer, he could not be held liable for her negligence under the theory of respondeat superior; and (2) the allegation that Dr. Sheehan had failed to properly train or supervise Dr. Peterson constituted a claim for medical malpractice and this claim was not supported by the expert affidavit attached to the complaint. In response to this motion, Bonner filed an amended expert affidavit, in which the expert opined that Bonner's injuries "resulted at least in part from a failure by Dr. Sheehan to exercise the required degree of skill and care to ensure that Dr. Peterson was properly supervised. . . ."

Dr. Peterson filed a separate motion to dismiss, asserting that, as a state employee, she was entitled to qualified immunity under the Georgia Tort Claims Act ("GTCA") (OCGA § 50-21-20 et seq.). She

further asserted that her status as a resident physician entitled her to immunity under OCGA § 51-1-38 (a), which provides tort immunity to medical students.

Following a hearing, the trial court granted both motions, and this appeal followed.

1. In granting Dr. Sheehan's motion, the trial court found that (i) the allegations of the complaint asserted a claim for professional negligence against Dr. Sheehan, based upon his failure to properly supervise or train Dr. Peterson; (ii) the expert affidavit attached to the complaint did not satisfy the requirements of OCGA § 9-11-9.1, because it failed to reference any negligent conduct by Dr. Sheehan or state that such conduct breached the applicable standard of care; and (iii) the amended affidavit did not cure this deficiency because it was filed after the statute of limitation had expired and it "essentially add[ed] an entirely new claim to the case, i.e., one of professional negligence against Dr. Sheehan." While we agree with the first two of these findings, we disagree with the third.

None of the parties disputes the trial court's finding that Bonner's original complaint asserted a claim against Dr. Sheehan for professional negligence. Although Bonner's complaint termed his claim against Dr. Sheehan as one for vicarious liability under the doctrine of respondeat superior, it alleged that Bonner's injuries resulted, in part, from "[Dr.] Sheehan's failure to properly supervise and/or train [Dr. Peterson]." As Dr. Sheehan acknowledges in his brief, "[this] allegation[ ] call[s] into question [Dr.] Sheehan's professional judgment in his area of expertise and, accordingly, the trial court properly ruled that the claim against [Dr.] Sheehan is . . . one for professional negligence. . . ." See also *Upson County Hosp. v. Head.*[4]

Nor do the parties dispute that OCGA § 9-11-9.1 required Bonner to support this claim by filing an expert affidavit which set forth at least one alleged negligent act or omission attributable to Dr. Sheehan and the factual basis for that allegation. See OCGA § 9-11-9.1 (a) (3); *HCA Health Svcs. &c. v. Hampshire*[5] (to satisfy the requirements of OCGA § 9-11-9.1, the expert affidavit must "set forth specifically at least one negligent act or omission claimed to exist as to each professional defendant (jointly, where appropriate; otherwise, severally) and the factual basis for the claim against each defendant"). Although Bonner's original expert affidavit failed to meet this requirement, the amended expert affidavit he filed in response to Dr. Sheehan's motion to dismiss did satisfy OCGA §

[4] *Upson County Hosp. v. Head*, 246 Ga. App. 386, 390 (1) (540 SE2d 626) (2000).
[5] *HCA Health Svcs. &c. v. Hampshire*, 206 Ga. App. 108, 110 (1) (424 SE2d 293) (1992).

9-11-9.1. The trial court, however, found that the amended affidavit did not save Bonner's claim against Sheehan from dismissal, because the amended affidavit asserted a "new" claim for malpractice after the statute of limitation had expired.[6] We disagree.

As a threshold matter, the trial court's conclusion that the affidavit set forth a new cause of action directly contradicts its finding that Bonner's claim against Dr. Sheehan was, in fact, a claim for medical malpractice, and therefore subject to the expert affidavit requirement of OCGA § 9-11-9.1. Rather than asserting a new claim, therefore, the amended affidavit merely supported the claim set forth in the complaint by alleging that the conduct of Sheehan which injured Bonner (conduct which was specified in the complaint) breached the applicable, professional standard of care — i.e., it constituted medical malpractice.

Moreover, OCGA § 9-11-9.1 (e) specifically allowed Bonner to amend his expert affidavit in response to Dr. Sheehan's motion. That statute provides, in relevant part:

> If a plaintiff files an affidavit which is allegedly defective, and the defendant to whom it pertains alleges, with specificity, by motion to dismiss filed on or before the close of discovery, that said affidavit is defective, the plaintiff's complaint shall be subject to dismissal for failure to state a claim, except that the plaintiff may cure the alleged defect by amendment pursuant to Code Section 9-11-15 within 30 days of service of the motion alleging that the affidavit is defective. . . .

Thus, subsection (e) allows a plaintiff to amend an allegedly defective expert affidavit to "present[ ] additional evidence of deviation from the standard of care against defendants sued in the

---

[6] It appears that the trial court confused the principles applicable to a motion to dismiss based upon the complete absence of an affidavit with a motion to dismiss based upon a deficient expert affidavit. Where a defendant files, *contemporaneously with his answer*, a separate motion to dismiss based upon the plaintiff's complete failure to attach an affidavit, the plaintiff is barred from voluntarily dismissing his complaint and then refiling it with the requisite affidavit after the statute of limitation has run. See *Chandler v. Opensided MRI of Atlanta*, 299 Ga. App. 145, 148 (2) (a) (682 SE2d 165) (2009). Such an action is not subject to the renewal provisions of OCGA § 9-6-21. Id. In this case, however, Dr. Sheehan did not file a motion to dismiss contemporaneously with his answer. More importantly, he did not move to dismiss based upon the complete absence of an affidavit, and we do not address whether such a motion would have been appropriate, given the failure of the original affidavit even to reference Dr. Sheehan. Rather, as Dr. Sheehan affirms in his brief, his motion to dismiss asserted that the expert affidavit was defective – i.e., he challenged the sufficiency of the affidavit as it pertained to him. As discussed infra, therefore, his motion to dismiss was subject to the provisions of OCGA § 9-11-9.1 (e).

original complaint *in order to meet the requirement that the affidavit set forth at least one claimed negligent act or omission by each defendant.*" (Emphasis supplied.) *Thomas v. Med Center of Central Ga.*[7] See also *Porquez v. Washington*[8] (OCGA § 9-11-9.1 (e) "affirms the legislative intent that a plaintiff have a broad right to cure by amendment an allegedly defective affidavit accompanying a charge of professional malpractice"). Such an amendment "does not defeat the purpose of [OCGA § 9-11-9.1], but instead helps to [e]nsure that the complaint is not frivolous." *Porquez*, 268 Ga. at 652 (1). Accordingly, where a plaintiff timely files an initial expert affidavit, he is entitled to subsequently supplement the same so that it adequately supports each claim of malpractice asserted against each of the defendants named in the complaint. *Bhansali v. Moncada.*[9]

Dr. Sheehan attempts to avoid this result by arguing that, following the expiration of the applicable limitation period, OCGA § 9-11-9.1 (e) does not allow a plaintiff to amend an affidavit to include allegations of negligence against a defendant who, although named in the complaint, was not mentioned in the original affidavit. This argument, however, finds no support in either the plain statutory language or the relevant case law. See *Thomas*, supra, 286 Ga. App. at 148 ("[a] plaintiff may amend an expert affidavit . . . [to] present[ ] additional evidence of deviation from the standard of care *against defendants sued in the original complaint*") (emphasis supplied); *Porquez*, supra, 268 Ga. at 652 (1). In short, despite Dr. Sheehan's arguments to the contrary, a plaintiff's right to amend an expert affidavit pursuant to OCGA § 9-11-9.1 (e) is in no way tied to the statute of limitation. Furthermore, we decline to make a malpractice plaintiff's right to amend under OCGA § 9-11-9.1 (e) contingent upon a defendant's decision, deliberate or otherwise, to delay challenging the sufficiency of an expert affidavit until after the expiration of the limitation period. The purpose of OCGA § 9-11-9.1 is to guard against frivolous lawsuits, not to serve as a tactical tool for defense counsel. See *Glaser v. Meck*;[10] *Chandler*, supra, 299 Ga. App. at 153 (2) (b).

Dr. Sheehan further argues that even if Bonner were otherwise permitted to amend his expert affidavit, the amendment was ineffective because he did not file an amended complaint pursuant to OCGA § 9-11-15, but instead filed the amended affidavit in response to Sheehan's motion to dismiss. This argument, however, directly

---

[7] *Thomas v. Med. Center of Central Ga.*, 286 Ga. App. 147, 148-149 (648 SE2d 409) (2007).

[8] *Porquez v. Washington*, 268 Ga. 649, 652 (1) (492 SE2d 665) (1997).

[9] *Bhansali v. Moncada*, 275 Ga. App. 221, 228 (2) (620 SE2d 404) (2005).

[10] *Glaser v. Meck*, 258 Ga. 468 (2) (369 SE2d 912) (1988).

448

contravenes the Supreme Court of Georgia's holding in *Bell v. Figueredo*.[11] In *Bell*, plaintiffs had filed a proper renewal of a medical malpractice action, but neglected to file with their complaint the expert affidavit they had filed in their original action. The defendants moved to dismiss the renewal action for failure to comply with OCGA § 9-11-9.1 and the plaintiffs filed a response, to which they attached the expert affidavit filed with their original complaint. The trial court nevertheless granted the motion to dismiss and this Court affirmed, holding that because the plaintiffs had not amended their complaint to add the affidavit, we could not review whether failure to file an expert affidavit constituted an amenable defect.[12] The Supreme Court of Georgia reversed, holding that even though it was filed in response to a motion to dismiss, the expert affidavit effectively amended the complaint to state a claim for malpractice, reasoning:

> The response [to the motion to dismiss] was filed at a time during the litigation when the right to amend without leave existed under OCGA § 9-11-15 (a). The [plaintiffs] simply failed to call that attachment an "amendment." It is well-established that there is no magic in nomenclature, and in classifying pleadings we will construe them to serve the best interests of the pleader, judging the pleading by its function rather than by its name. In the present case the affidavit functioned as an amendment to the complaint even though it was called by another name. We hold that under the circumstances of this case the [plaintiffs] cured their defective complaint by filing an affidavit in response to the [defendants'] motion to dismiss and thereby complied with OCGA § 9-11-9.1.

(Citation and punctuation omitted.) Id. at 322-323.

The same rationale applies here. Accordingly, the amended expert affidavit filed in response to Dr. Sheehan's motion to dismiss operated to effectively amend Bonner's complaint to state a claim against Dr. Sheehan for malpractice. We therefore reverse that part of the trial court's order dismissing Bonner's claim against Dr. Sheehan.

2. The trial court's dismissal of Bonner's claims against Dr. Peterson was based on its findings that Dr. Peterson was entitled to qualified immunity under both OCGA § 51-1-38 and the GTCA. While we disagree with the trial court's finding that Peterson was

---

[11] *Bell v. Figueredo*, 259 Ga. 321 (381 SE2d 29) (1989).
[12] See *Bell v. Figueredo*, 190 Ga. App. 163, 165 (2) (378 SE2d 475) (1989).

entitled to tort immunity under OCGA § 51-1-38, we agree with its finding that the GTCA did provide her with such immunity.

(a) OCGA § 51-1-38 affords tort immunity to medical students and provides:

> (a) No *student* who participates in the provision of medical care or medical treatment under the supervision of a medical facility, academic institution, or doctor of medicine, *as a part of an academic curriculum leading to the award of a medical degree*, shall be liable for any civil damages as a result of any act or omission in such participation, except for willful or wanton misconduct.
>
> . . .

(Emphasis supplied.)

In finding that this statute provided immunity to Dr. Peterson, the trial court reasoned that her status as a resident physician "was akin to that of a [medical] student." This reasoning, however, ignores the statutory language which expressly limits the immunity afforded by OCGA § 51-1-38 (a) to students working toward a medical degree. While resident physicians may resemble students in that they are still training, they are not participating in residency programs "as a part of an academic curriculum leading to the award of a medical degree." Rather, they already have their medical degrees and are at least provisionally licensed to practice medicine. See OCGA § 43-34-33 (a).

More importantly, the trial court's reasoning ignored entirely the language of OCGA § 51-1-38 (b), which provides that "[s]ubsection (a) of this Code section *shall not be construed* to affect or limit the liability of a medical facility, academic institution, *or doctor of medicine*." (Emphasis supplied.) Because resident physicians are, in fact, medical doctors, this language prohibits courts from extending to them the immunity afforded by subsection (a). Accordingly, the trial court erred in finding that Dr. Peterson was entitled to immunity under OCGA § 51-1-38.

(b) We next address the question of whether Dr. Peterson's status as a resident physician at MCG entitled her to qualified immunity under the GTCA, which provides official immunity to any state employee "who commits a tort while acting within the scope of his or her official duties or employment. . . ." OCGA § 50-21-25 (a). On appeal, Bonner does not dispute that Dr. Peterson was a state employee who treated him in her position as a resident physician at MCG. Rather, he argues that under the Supreme Court of Georgia's

decision in *Keenan v. Plouffe*,[13] Dr. Peterson's medical treatment of him fell outside the scope of her official duties as a state employee.

In *Keenan*, the Supreme Court of Georgia ruled that an attending physician and faculty member at MCG was not acting within the scope of his state employment when he performed surgery on a "private-pay" patient — i.e., a patient whose treatment was funded by a third-party, private insurer. 267 Ga. at 793 (1). Relying on the Virginia Supreme Court's decision in *James v. Jane*,[14] the court reasoned that the attending physician was not acting within the scope of his official duties because: (i) the patient was not one the attending physician was obligated to treat by virtue of his position as a faculty member at MCG, but was instead a private-pay patient who had employed the attending physician directly (id. at 793 (2)); (ii) the patient was billed separately for the professional services of the attending physician through an entity other than MCG (id. at 792); (iii) this same entity provided the attending physician with compensation, in the form of fringe benefits and professional liability insurance, that was separate from and in addition to the compensation he received in his capacity as a faculty member at MCG (id.); (iv) the attending physician's treatment of the patient was left "to his sole medical discretion" (id. at 793 (2)); and (v) the allegations of negligence "relate[d] solely to [the attending physician's] independent medical judgment in treating [the patient]." Id. at 795 (2).

The language used in *Keenan*, however, reflects that the holding was specifically limited to attending physicians.[15] Id. at 794 (2). The question presented by this case, therefore, is whether the rationale of *Keenan* should apply to deprive resident physicians employed by MCG of immunity from medical malpractice actions brought by patients he or she treats in the course of a state-run residency program. For the reasons explained below, we find that it should not.

First, while we are obligated to abide by *Keenan* where applicable, we are also constrained to interpret it narrowly. This is because *Keenan* represents a judicially-created exception to the immunity afforded the State and its employees by both the Georgia Constitution and the legislature. See *Clark v. State of Ga.*[16] ("the doctrine of state sovereign immunity now has constitutional status

---

[13] *Keenan v. Plouffe*, 267 Ga. 791 (482 SE2d 253) (1997).

[14] *James v. Jane*, 221 Va. 43 (282 SE2d 864) (1980).

[15] Arguably, *Keenan* does not even apply to all attending physicians employed by MCG. Given the court's reasoning, *Keenan* might apply only in those situations where the attending physician who treats a private-pay patient receives some compensation for his services that is different from and/or in addition to the compensation provided him as a faculty member at MCG. We do not address whether such factors existed with respect to Dr. Sheehan's treatment of Bonner, because that question is not before us.

[16] *Clark v. State of Ga.*, 240 Ga. 188 (240 SE2d 5) (1977).

and cannot be abrogated or modified by this court"); *Johnson v. E. A. Mann & Co.*[17] (while the General Assembly may statutorily provide the terms and conditions of any waiver of sovereign immunity, the courts may not abrogate or modify such immunity); *Howard v. State of Ga.*[18] ("the [GTCA], by its own terms, must be strictly construed"). See also *Cummings v. Ga. Dept. of Juvenile Justice*[19] ("it is our duty to refrain from any modification or abrogation of the GTCA") (Melton, J., dissenting). Accordingly, this Court has declined to extend *Keenan* beyond the specific circumstances presented by that case — i.e., to cases that do not involve the alleged negligence of an attending physician in treating a private-pay patient. See *Porter v. Guill*[20] (attending physician employed by MCG entitled to qualified immunity for liability resulting from allegedly negligent treatment of a nonprivate-pay patient); *Green v. Central State Hosp.*[21] (physician, employed through MCG as prison medical director, was acting within scope of employment in treating prisoner and was therefore entitled to qualified immunity for any liability resulting from that treatment); *Schulze v. DeKalb County*[22] ("[g]iven the limited scope of *Keenan*, it is inapplicable to county-employed paramedics who are not physicians and who did not treat a private-pay patient").

Moreover, the factors the *Keenan* court relied on to fashion the exception to qualified immunity for attending physicians do not exist with respect to resident physicians. The record shows that resident physicians, unlike attending physicians, are subject to the control and direction of others. Specifically, resident physicians work under and are supervised by attending physicians. They have no hospital privileges and they are not empowered to make any unilateral decisions regarding the treatment of patients. Patients do not make appointments with resident physicians and residents have no control over which patients they see. Instead, resident physicians treat patients who are also being treated by an attending physician. Additionally, unlike attending physicians, resident physicians receive no compensation, either directly or indirectly, from any patient. Rather their only compensation is paid by MCG, and that compensation does not vary based upon either the number of patients seen or the number of procedures performed. Applying the rationale of *Keenan*, therefore, we conclude that state-employed resident physicians are entitled to immunity from liability arising from their

---

[17] *Johnson v. E. A. Mann & Co.*, 273 Ga. App. 716, 720 (616 SE2d 98) (2005).

[18] *Howard v. State of Ga.*, 226 Ga. App. 543 (1) (487 SE2d 112) (1997).

[19] *Cummings v. Ga. Dept. of Juvenile Justice*, 282 Ga. 822, 828 (653 SE2d 729) (2007).

[20] *Porter v. Guill*, 298 Ga. App. 782, 787 (1) (c) (681 SE2d 230) (2009).

[21] *Green v. Central State Hosp.*, 275 Ga. App. 569, 572 (2) (621 SE2d 491) (2005).

[22] *Schulze v. DeKalb County*, 230 Ga. App. 305, 309 (3) (496 SE2d 273) (1998).

treatment of patients during the course of their residency.

This conclusion is supported by the primary case on which *Keenan* relied, *James v. Jane,* supra, in which the Virginia Supreme Court made clear that resident and attending physicians should be treated differently with respect to qualified immunity. *James* reaffirmed the decision in *Lawhorne v. Harlan,*[23] which held that medical residents employed in state-run training programs were entitled to immunity from suits for professional negligence. In reaching that decision, the court in *Lawhorne* relied on the fact that the surgical resident in question was a salaried employee of a state university, was subject to the direction and control of his employer, had no contractual relationship with the university hospital's patients, received no compensation from the patients he treated, and was not empowered to make independent decisions regarding the treatment of patients. 214 Va. at 408. See also *Gargiulo v. Ohar*[24] (holding that a licensed, board-certified physician employed as a fellow in a state-run research program was entitled to immunity from suit by patients she treated during the course of her fellowship, because the physician received no compensation from patients, was not allowed to choose or refuse patients, and was subject to the supervision of attending physicians).

As the foregoing demonstrates, neither the rationale of *Keenan* nor the legal authority relied upon in that case supports the conclusion that resident physicians should be deprived of the immunity otherwise afforded them by the GTCA. Accordingly, Dr. Peterson is entitled to immunity for the malpractice claims asserted against her by Bonner, and we affirm that part of the trial court's order dismissing those claims.

*Judgment affirmed in part and reversed in part. Adams and Doyle, JJ., concur.*

DECIDED DECEMBER 8, 2009.

*Randolph Frails, Edwin A. Wilson,* for appellant.

*Thurbert E. Baker, Attorney General, Claude M. Sitton, Assistant Attorney General, Rutherford & Christie, Vincent A. Toreno, Parker M. Green,* for appellees.

---

[23] *Lawhorne v. Harlan,* 214 Va. 405 (200 SE2d 569) (1973), rev'd on other grounds, *First Virginia Bank-Colonial v. Baker,* 225 Va. 72 (301 SE2d 8) (1983).

[24] *Gargiulo v. Ohar,* 239 Va. 209, 215 (V) (387 SE2d 787) (1990).