A10A0455. UPPER OCONEE BASIN WATER AUTHORITY
v. JACKSON COUNTY.
(699 SE2d 605)

ADAMS, Judge.

Appellee Jackson County filed a petition for declaratory judgment against appellant Upper Oconee Basin Water Authority (the "Authority"). The Authority filed a motion to dismiss, arguing that the County's action was barred by sovereign immunity and, alternatively, that the petition failed to state a claim under OCGA § 9-11-12 (b) (6). The County then amended its petition to include counts for breach of contract/specific performance and injunctive relief. The trial court denied the motion to dismiss, and the Authority appeals.

Pursuant to the Upper Oconee Basin Water Authority Act, the

---

[12] (Footnotes omitted.) *ServiceMaster Co. v. Martin*, 252 Ga. App. 751, 754 (2) (556 SE2d 517) (2001).

[13] Id.

Authority was created in 1994 for the purpose of

> acquiring and developing adequate sources of water supply, including but not limited to the construction of reservoirs; the treatment of such water, and thereafter the transmission of such water within the Upper Oconee Basin area, and to various counties, municipalities, and public authorities located therein; and the collection and treatment of waste water from the counties, municipalities, and public authorities within the . . . area.

Ga. L. 1994, pp. 5123, 5125, § 4. Athens-Clarke, Barrow, Jackson and Oconee Counties comprise the "Member Counties" under the Act. Ga. L. 1994, p. 5126, § 5 (a) (6).

In 1996, the Authority and the Member Counties entered into a 50-year Intergovernmental Reservoir and Raw Water Supply Agreement ("Agreement") to further the purposes of the Act to construct reservoirs and treat and transmit that water to the Member Counties. Pursuant to the Agreement, the Authority was to plan, build and manage the Bear Creek Reservoir, which would serve as a source of water to the Member Counties.

As is pertinent here, Article II of the Agreement states:

> The Authority shall provide or cause to be provided and each Member County may take from the Authority its Entitlement Share of the Water Supply pursuant to Section 306. The Authority will be responsible for planning, negotiating, designing, financing, acquiring or constructing, contracting for, administering, operating, and maintaining the Project as necessary to effect the delivery and sale of such Water Supply to each Member County.

Section 102 (k) of the Agreement expressly assigns "Entitlement Shares" to each Member County,[1] and Section 301 of the Agreement obligates the Authority to "cause to be delivered or make available for delivery to the Member Counties during each month of each Water Supply Year its Entitlement Share. . . ." Section 306 further specifies how much water each Member County is allowed to withdraw. Pursuant to that section, "the maximum quantity that may be withdrawn by any Member County . . . shall be limited to a quantity equal to the EPD approved Established Yield of the Project multiplied by the Member County's Entitlement Share of the

---

[1] The Entitlement Shares of each Member County are as follows: Athens-Clarke: 44 percent; Barrow: 19 percent; Jackson: 25 percent; and Oconee: 12 percent.

Project." "EPD approved Established Yield" is not defined in the Agreement, but subsection (a) (1) of Section 306 defines "Established Yield" to mean "the maximum rate of withdrawal which can be sustained during critical dry periods as established by a mathematical simulation of the reservoir operation as it would have occurred during the worst historic drought for which applicable streamflow records are available."

In 2008, the County requested that the Authority hire an independent third party to recalculate the Established Yield. The County made this request based on assertions that the Established Yield was originally miscalculated by the Authority because the initial mathematical simulation to determine that Yield wrongly assumed the use of variable instead of single speed pumps, which had the effect of falsely increasing the Established Yield and which allegedly allows the Member Counties to consume more of the Reservoir's output than the members are entitled to use. Further, the County contended that the Authority should recalculate the Established Yield to incorporate the streamflow records for the year 2007 because those records reflect the "worst historic drought for which applicable stream flow records are available." The County contended that recalculations based on those records would also result in a reduction of the Established Yield.[2]

The Authority denied the County's request to recalculate the Established Yield, and the County filed its petition, as amended, seeking: (1) A judgment that the Authority has breached Section 306 of the Agreement and an order requiring the Authority to comply with the terms of the Agreement; (2) An injunction prohibiting the Authority from operating the Reservoir with the current Established Yield; and (3) A declaration that the current Established Yield does not conform to the definition set forth in the Agreement and a determination requiring the Authority to recalculate the Established Yield.

1. Under the Georgia Constitution, sovereign immunity extends to the state, political subdivisions of the state, and all of its departments and agencies. Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e); *Hennessy v. Webb*, 245 Ga. 329 (264 SE2d 878) (1980). The General Assembly has the power in creating an Authority to deem it a political subdivision of the State, *Henderman v. Walton County Water &c. Auth.*, 271 Ga. 192, 193 (515 SE2d 617) (1999), and the legislation creating the Authority in this case specifically provides

---

[2] The County argues that, properly calculated, the Established Yield should be approximately 24 million gallons per day instead of 58 million gallons per day, the amount the Authority is currently permitted to withdraw.

that it "shall be deemed to be a political subdivision of the State of Georgia. . . ." Ga. L. 1994, p. 5125, § 3. Thus, the Authority is immune from suit unless immunity has been "waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver." Ga. Const of 1983, Art. I, Sec. II, Par. IX (e). The threshold issue in this case is thus whether there has been an applicable exception or waiver to the claims asserted here.

> A motion to dismiss asserting sovereign immunity . . . is based upon the trial court's lack of subject matter jurisdiction, rather than the merits of the plaintiff's claim. The party seeking to benefit from the waiver of sovereign immunity has the burden of proof to establish waiver, and the trial court's pretrial ruling on factual issues necessary to decide the OCGA § 9-11-12 (b) (1) motion is reviewed on appeal under the any evidence rule.

*Bonner v. Peterson*, 301 Ga. App. 443 (687 SE2d 676) (2009). We are also mindful that the courts may not abrogate or modify the State's immunity, and any consent to be sued must be strictly construed. E.g., *Sawnee Elec. Membership Corp. v. Ga. Dept. of Revenue*, 279 Ga. 22, 23 (2) (608 SE2d 611) (2005); *Bonner*, 301 Ga. App. at 450-451.

The County argues that the claim asserted in its amended petition "derives from terms and obligations set forth in the [Agreement]" and thus the waiver of immunity to actions based on written contracts applies here. See Ga. Const. of 1983, Art. I, Sec. II, Par. IX (c) ("The state's defense of sovereign immunity is hereby waived as to any action ex contractu for the breach of any written contract now existing or hereafter entered into by the state or its departments and agencies"); OCGA § 50-21-1 (in essence the same). Specifically, the County argues that its amended petition sets forth a breach of contract action alleging the Authority breached the Agreement by failing to recalculate the Established Yield and seeking specific performance to remedy that alleged breach. It points to the fact that it is also seeking injunctive relief to enjoin the Authority from operating the Reservoir in such a way that will allow a Member County to use another Member County's Entitlement Share. And it argues it seeks a declaratory judgment that the Authority has failed to comply with the Agreement because the Established Yield was calculated improperly with the result that the actual capacity of the Reservoir is significantly less than the EPD approved Established Yield.

It is clear that, nomenclature aside, the essence of the County's claim is for breach of the Agreement. Pursuant to the Agreement,

the Authority had an obligation to provide water to the Member Counties *under the provisions of the Agreement.* The County claims that the Authority breached these provisions by failing to properly calculate the Entitlement Shares of the Counties based on the method specified in the Agreement in two respects — that it failed to calculate an accurate yield before submitting that yield to the EPA for approval and that it failed to recalculate the Established Yield to incorporate the most recent stream flow data. The fact that the County is seeking specific performance of the agreement instead of monetary damages does not change the essential nature of the claim. Likewise, the fact that the County has expressly asked for the Authority's obligations under the Agreement to be determined and enforced does not change the essential nature of the claim here.

Moreover, Section 501 of the Agreement itself provides:

> In the event of any default by the Authority under any covenant, agreement or obligation of this Agreement, . . . each Member County may bring any suit, action or proceeding in law or in equity, including mandamus, injunction, and action for specific performance as may be necessary or appropriate to enforce any covenant, agreement or obligation o[f] this Agreement against the Authority.[3]

Thus the Agreement itself contemplates enforcement of the Agreement through an action for specific performance or by seeking injunctive relief in the event of an alleged default. Based on the foregoing, we find that the trial court did not err by refusing to dismiss the amended petition on the basis of sovereign immunity.

2. The Authority also moved to dismiss based on a failure to state a claim upon which relief could be granted. OCGA § 9-11-12 (b) (6). In separate enumerations of error, the Authority now contends that the trial court erred by failing to dismiss the County's claims for declaratory relief, breach of contract/specific performance and injunction on this basis.

> It is well settled that (a) motion to dismiss for failure to state a claim upon which relief can be granted "should not be sustained unless (1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted

---

[3] Since sovereign immunity can only be waived by an act of the legislature, this section would not, in and of itself, constitute a waiver of sovereign immunity. However, it does demonstrate the kind of remedies that the parties contemplated in the event of a default under the Agreement.

in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought. In deciding a motion to dismiss, all pleadings are to be construed most favorably to the party who filed them, and all doubts regarding such pleadings must be resolved in the filing party's favor." (Cit.) *Stendahl v. Cobb County*, 284 Ga. 525 (1) (668 SE2d 723) (2008).

*Southstar Energy Svcs. v. Ellison*, 286 Ga. 709, 710 (1) (691 SE2d 203) (2010).

We review de novo a trial court's ruling on a motion to dismiss. Id.

(a) The Authority first contends that the County failed to state a claim for declaratory relief pursuant to the Declaratory Judgment Act, OCGA § 9-4-1, because the County is not in a position of uncertainty with respect to its future course of conduct. See, e.g., *Baker v. City of Marietta*, 271 Ga. 210, 215 (1) (518 SE2d 879) (1999).

The County alleges uncertainty as to its future rights because (1) it does not know how much of its Entitlement Share from the Reservoir it can consume and (2) it is unsure of how to plan for future development in Jackson County without a determination as to the actual capacity of the Reservoir. The Authority argues that despite these allegations, the County "faces no uncertainty as to the permitted maximum quantity of water which it is *authorized* to withdraw from the . . . Reservoir." We agree with the County that this assertion misconstrues the nature of the allegations contained in the amended petition. Unquestionably, the County knows its Entitlement Share and how much it is authorized to draw under the Agreement based on the original calculations of the Established Yield. However, taking the allegations of the complaint as true, if that amount was miscalculated or is subject to recalculation, either because the original mathematical simulation used to calculate the Established Yield was faulty, or because the Established Yield must be recalculated to take into effect the records for the drought of 2007, then the requisite uncertainty may well exist. Thus we cannot say that under any state of provable facts, the County has failed to state a claim because it cannot show that its rights under the Agreement have become uncertain. This enumeration thus presents no basis for reversal.

(b) Breach of Contract Claims. The essence of the claims here are for breach of contract, and we have little hesitancy in concluding that claim is not subject to dismissal for failure to state a claim. As stated above, the County has asserted that the Authority breached the Agreement by failing to properly calculate the initial Established Yield that was approved by the EPD and by failing to recalculate the

Established Yield using the stream data from the drought of 2007. The Authority argues that under the plain and unambiguous terms of the contract this contention must fail because the EPD, not the Authority, determines the Established Yield and nothing in the Agreement allows the interpretation given to the Agreement by the County's pleadings, which would require the Authority "to disregard the EPD approved Established Yield of the Reservoir in favor of a lower quantity." The County argues that the Agreement establishes that it is the obligation of the Authority to determine the Established Yield as defined in the Agreement and that it will present evidence to show that in fact the Authority did calculate the initial Established Yield that was ultimately approved by the EPD. We agree with the County that the parties' differing interpretations of the Agreement may demonstrate contract ambiguity; however, construing the allegations of the petition in favor of the County, as we must under the appropriate standard, we agree with the trial court that the breach of contract claim is not subject to dismissal for failure to state a claim under OCGA § 9-11-12 (b) (6).

(c) Lastly, as to the claims for injunctive relief, the County argues that the imminent and irreparable injury may occur if in fact it is determined that the Established Yield has been miscalculated and the Member Counties are being allowed to withdraw too much water from the Reservoir such that it might run dry. Again, we cannot say under any state of provable facts that the County would not be entitled to injunctive relief to prevent this alleged harm.

Based on the foregoing, we affirm the denial of the Authority's motion to dismiss.

*Judgment affirmed. Smith, P. J., and Mikell, J., concur.*

DECIDED JULY 14, 2010 —
RECONSIDERATION DENIED JULY 29, 2010 — ▇▇▇▇▇▇

*Ekonomou, Atkinson & Lambros, Paul E. Nystrom III,* for appellant.

*Balch & Bingham, Michael J. Bowers, Marlie A. McDonnell,* for appellee.