**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 21, 2014**

# In the Court of Appeals of Georgia

A14A0805. JACKSON COUNTY v. UPPER OCONEE BASIN WATER AUTHORITY.

BOGGS, Judge.

This is the second appearance of this case before this court. In our previous opinion, we affirmed the denial of the Upper Oconee Basin Water Authority's ("the Authority's") motion to dismiss multiple claims filed by Jackson County ("the County"). *Upper Oconee Basin Water Auth. v. Jackson County*, 305 Ga. App. 409 (699 SE2d 605) (2010) ("*Oconee Basin I*"). In this case, the County appeals from the trial court's grant of the Authority's motion for summary judgment and the denial of its cross-motion for summary judgment. For the following reasons, we affirm.

It is well-established that

[o]n appeal from a grant or denial of summary judgment, we conduct a de novo review of the law and evidence. In applying this standard of

review, we view the evidence in the light most favorable to the nonmovant to determine whether a genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law.

(Citation and punctuation omitted.) *BAC Home Loans Svcs. v. Wedereit*, 328 Ga. App. 566 (759 SE2d 867) (2014); see also OCGA § 9-11-56 (c).

1. The relevant facts here are provided in this court's prior opinion:

Pursuant to the Upper Oconee Basin Water Authority Act, the Authority was created in 1994 for the purpose of

> acquiring and developing adequate sources of water supply, including but not limited to the construction of reservoirs; the treatment of such water, and thereafter the transmission of such water within the Upper Oconee Basin area, and to various counties, municipalities, and public authorities located therein; and the collection and treatment of waste water from the counties, municipalities, and public authorities within the . . . area.

Ga. L. 1994, pp. 5123, 5125, § 4. Athens-Clarke, Barrow, Jackson and Oconee Counties comprise the "Member Counties" under the Act. Ga. L. 1994, p. 5126, § 5 (a) (6).

In 1996, the Authority and the Member Counties entered into a 50-year Intergovernmental Reservoir and Raw Water Supply Agreement

2

("Agreement") to further the purposes of the Act to construct reservoirs and treat and transmit that water to the Member Counties. Pursuant to the Agreement, the Authority was to plan, build and manage the Bear Creek Reservoir, which would serve as a source of water to the Member Counties.

As is pertinent here, Article II of the Agreement states:

> The Authority shall provide or cause to be provided and each Member County may take from the Authority its Entitlement Share of the Water Supply pursuant to Section 306. The Authority will be responsible for planning, negotiating, designing, financing, acquiring or constructing, contracting for, administering, operating, and maintaining the Project as necessary to effect the delivery and sale of such Water Supply to each Member County.

Section 102 (k) of the Agreement expressly assigns "Entitlement Shares" to each Member County,[1] and Section 301 of the Agreement obligates the Authority to "cause to be delivered or make available for delivery to the Member Counties during each month of each Water Supply Year its Entitlement Share. . . ."

---

[1]"The Entitlement Shares of each Member County are as follows: Athens-Clarke: 44 percent; Barrow: 19 percent; Jackson: 25 percent; and Oconee: 12 percent." *Oconee Basin I*, supra, 305 Ga. App. at 410 n.1.

Section 306 further specifies how much water each Member County is allowed to withdraw. Pursuant to that section, "the maximum quantity that may be withdrawn by any Member County . . . shall be limited to a quantity equal to the EPD[2] approved Established Yield of the Project multiplied by the Member County's Entitlement Share of the Project." "EPD approved Established Yield" is not defined in the Agreement, but subsection (a) (1) of Section 306 defines "Established Yield" to mean "the maximum rate of withdrawal which can be sustained during critical dry periods as established by a mathematical simulation of the reservoir operation as it would have occurred during the worst historic drought for which applicable streamflow records are available."

*Oconee Basin I*, supra, 305 Ga. App. at 409-411 (1). In November 1996, four months after the parties entered into the Agreement, an engineer retained by the Authority submitted a hydrology report to the EPD in which he concluded that the peak monthly yield of the reservoir was 58.3 MGD (million gallons per day ) using the "most critical drought period of 1986-1989."

Upon completion of the construction of the reservoir in April 2002, the EPD concurred with the conclusions presented in the hydrology report and granted the Authority's request for a surface water withdrawal permit not to exceed 58 MGD. The

---

[2]The Environmental Protection Division of the Georgia Department of Natural Resources.

4

permit noted that the County was to receive a 25% entitlement share of the 58 MGD monthly average. A permit pursuant to the same conditions was issued in 2007, with an expiration date of April 2022.

> In 2008, the County requested that the Authority hire an independent third party to recalculate the Established Yield . . . . [T]he County contended that the Authority should recalculate the Established Yield to incorporate the streamflow records for the year 2007 because those records reflect the "worst historic drought for which applicable stream flow records are available." The County contended that recalculations based on those records would . . . result in a reduction of the Established Yield.[3]

*Oconee Basin I*, supra, 305 Ga. App. at 411 (1).

When the Authority denied the County's request to recalculate the Established Yield, the County filed an action asserting breach of the Agreement by the Authority's failure to comply with its terms. The parties later filed cross-motions for summary judgment. Following a hearing, the trial court granted the Authority's motion for summary judgment and denied the County's motion, finding that the

---

[3]"The County argues that, properly calculated, the Established Yield should be approximately 24 million gallons per day instead of 58 million gallons per day, the amount the Authority is currently permitted to withdraw." *Oconee Basin I*, supra, 305 Ga. App. at 411 (1) n.2.

Agreement did not require a recalculation of the Established Yield based upon a future drought, the EPD approved Established Yield governs the quantity of water which the Authority must make available to the County, and that "[i]t would have been illogical for the parties to have incurred the expense to construct the treatment plant had they contemplated that the yield of the Reservoir could be permanently and drastically reduced based upon one future weather event." We agree with the trial court's result here, but affirm based only upon the plain language of the Agreement.

2. The County complains of the trial court's ruling on the cross-motions for summary judgment, arguing that the court erred in finding that the Agreement does not require the Established Yield to be recalculated using the streamflow data for the new worst historic drought of 2007-2008.

> To begin with, we note that the construction of a contract is a question of law for the court. And the construction of a contract involves three steps. The first step is to decide whether the language of the contract is clear and unambiguous. If so, the contract is enforced according to its plain terms, and the contract alone is looked to for meaning. Second, if the language of the contract is ambiguous in some respect, the rules of contract construction must be applied by the court to resolve the ambiguity. And finally, if ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what

6

the parties intended must be resolved by a jury. Indeed, the cardinal rule of contract construction is to ascertain the intention of the parties.

(Citation, punctuation and footnotes omitted.) *Bd. of Commrs. of Crisp County v. City Commrs. &c. of Cordele*, 315 Ga. App. 696, 699 (727 SE2d 524) (2012).

In its complaint, the County alleged that the Authority breached the Agreement by failing to "properly calculate and recalculate the Established Yield as required in Section 306 (a)." It is well-settled that "the terms and phrases contained in a contract must be given their ordinary meaning." (Citation and punctuation omitted.) *Unified Government of Athens-Clarke County v. McCrary*, 280 Ga. 901, 903 (635 SE2d 150) (2006).

It is equally well-settled that no construction is required or even permissible when the language employed by the parties in their contract is plain, unambiguous, and capable of only one reasonable interpretation. In such an instance, the language used must be afforded its literal meaning and plain ordinary words given their usual significance, and this rule applies equally as well to insurance contracts as to any other contract.

(Citation and punctuation omitted.) Id.

The County contends that the Agreement does not tie the Established Yield to the EPD permitted amount, but to the Established Yield as that term is defined in the

7

Agreement, and that the Authority is required to recalculate the Established Yield based upon the new worst historic drought of 2007-2008. But the Agreement does not require the Authority to make such calculation; rather, it states the meaning of the term "Established Yield," and defines this term as the product of a mathematical simulation under certain conditions. The Agreement does not name the party that is responsible for conducting that simulation, nor does it provide when the simulation is to be conducted. Simply put, it only defines the meaning of "Established Yield." Moreover, the Agreement does not obligate the Authority to provide the County with an "Established Yield." Rather, the Authority's obligation pursuant to the Agreement is to allow the County to withdraw a maximum quantity of water equal to the "*EPD approved* Established Yield" (emphasis supplied), and it is undisputed that the Authority made this amount available. No evidence in the record shows a different "EPD approved Established Yield," and the Agreement does not include a provision requiring the Authority to conduct multiple simulations based upon changing data.

The County argues that Section 306 (b) of the agreement shows that the parties intended that the Established Yield could be reduced based on future events. That section provides:

8

Each Member County shall pay its Entitlement Share of Annual Project Costs set forth in the monthly Billing Statements submitted by the Authority to each Member County in accordance with the provisions of Section 305, hereof, whether or not the Project or any part thereof has been completed, is operating or operable or its output is suspended, interrupted, interfered with, reduced or curtailed or terminated in whole or in part, and such payments shall not be subject to reduction whether by offset or otherwise and shall be conditional upon the performance or nonperformance by any party of any agreement for any cause whatever.

But this section speaks to only the *payment obligations* of the Member Counties whether or not the "Project or any part thereof has been completed." While the term "Project" is defined by Section 102 (n) of the Agreement to include the "sale of water to wholesale users which are the Member Counties for the purpose of resale," it does not include and makes no reference to Established Yield or the calculation thereof. This provision simply does not show that the parties intended that the Established Yield be reduced based upon future events.

Because the Authority could not be in breach of an obligation to recalculate the Established Yield when such an obligation does not exist under the plain language of the Agreement, the trial court did not err in concluding that "the Authority is entitled to summary judgment on [the] County's claims since its refusal to recalculate

9

or reduce the yield of the Reservoir as demanded by Jackson County did not breach the [Agreement]."

3. The County argues further that the trial court erred in "finding that 58 MGD is the only yield approved by the EPD" because "any rate of withdrawal below the EPD maximum permitted levels are EPD approved." The County is correct that the trial court stated in its order: "it is undisputed that the 'EPD approved Established Yield' of the Reservoir is 58 MGD, the only yield actually reviewed and approved by the EPD." But the court also correctly stated that the withdrawal was "*not to exceed a monthly average of 58 MGD,*" that the "'*EPD approved* Established Yield' . . . governs the *quantity of water* which the Authority *must make available* to its member counties," and that "it is the '*EPD approved Established Yield* which . . . determines the *maximum* quantity of water that such member may receive." (Emphasis supplied.) We find no merit in the County's argument here, because it is clear that the trial court's ruling was based upon a finding that the Authority was required to make available no more than the EPD approved Established Yield of 58 MGD. And "Established Yield" is defined in the Agreement as the "*maximum* quantity that may be withdrawn." (Emphasis supplied.) Therefore any less amount is not the "Established Yield."

10

For the above-stated reasons, the trial court did not err in granting the Authority's motion for summary judgment and in denying the County's motion.

*Judgment affirmed. Barnes, P. J., and Branch, J., concur*.