A09A0028. PORTER et al. v. GUILL.
A09A0029. MEGOW v. PORTER et al.
(681 SE2d 230)

BLACKBURN, Presiding Judge.

Following the death of their five-month-old son, Rhonda Berrian Porter and Andre Porter, individually and as the natural parents of Jabaris Dre'Kwand Porter ("the Porters"), filed suit against a number of defendants, including Kimberly W. Megow, M.D. and Margaret Guill, M.D., asserting claims for medical malpractice and wrongful death. After the Porters dismissed their claims against all the other defendants, Dr. Megow and Dr. Guill filed separate motions for summary judgment.

The trial court granted Dr. Guill's motion, finding that because she treated Jabaris in her capacity as a faculty member at the Medical College of Georgia ("MCG"), Dr. Guill was entitled to official immunity. The trial court denied Dr. Megow's motion, holding that the conflict between the affidavit and deposition testimony of the Porters' pediatric expert created a question of fact on the causation element of the Porters' negligence claim against Dr. Megow. These rulings form the basis of the two appeals which are consolidated in this opinion. For the reasons set forth below, we affirm in both cases.

> We review a trial court's grant of summary judgment de novo. To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact, and that the undisputed facts, viewed in a light most favorable to the party opposing the motion, warrant judgment as a matter of law. A defendant need not produce any evidence to obtain summary judgment, but must only point to an absence of evidence supporting at least one essential element of the plaintiff's claim.

(Citations and punctuation omitted.) *Triple Net Properties v. Burruss Dev. & Constr.*[1]

So viewed, the evidence shows that Dr. Megow, a pediatrician in private practice, served as Jabaris's regular physician from his birth on November 24, 2002, until his admission to MCG on April 12, 2003. Between December 9, 2002 and April 7, 2003, Dr. Megow treated Jabaris at least eight times for persistent wheezing and other respiratory-related problems. Dr. Megow admitted Jabaris to the hospital at South Georgia Medical Center ("SGMC") on March 18, 2003 for treatment of his breathing problems, and eventually diagnosed him with asthma.

On April 7, 2003, after Jabaris's breathing problems became more persistent and he failed to show any sustained improvement, Dr. Megow's office began the process of referring Jabaris to the pediatric pulmonology department at MCG. On April 10, 2003, a nurse in Dr. Guill's office at MCG spoke with a nurse-practitioner in Dr. Megow's office to get a more detailed case history. Dr. Guill's nurse suggested that Jabaris should be seen at MCG as soon as possible.

The following day, Dr. Megow admitted Jabaris to the hospital at SGMC a second time, to await his transfer to MCG.[2] On Saturday, April 12, 2003, Dr. Megow discussed the case with Dr. Guill, the

---

[1] *Triple Net Properties v. Burruss Dev. & Constr.*, 293 Ga. App. 323 (667 SE2d 127) (2008).

[2] Dr. Megow delayed Jabaris's transfer to MCG until April 12, and admitted Jabaris to

on-call physician for the MCG pediatric pulmonology department that weekend. The physicians spoke by phone, with Dr. Megow providing Dr. Guill with a summary of the case and "what had occurred [with Jabaris] up until that point."

Dr. Guill, in her capacity as the on-call pediatric pulmonologist, admitted Jabaris to the hospital at MCG on Saturday, April 12, as a pediatric pulmonology patient. Dr. Guill testified that the communication she had with Dr. Megow regarding Jabaris was a common method of arranging "urgent admissions" to the pediatric pulmonology department.

After admitting Jabaris, Dr. Guill served as his treating physician for the remainder of the weekend. On Monday, April 14, Dr. Valerie Hudson became the physician-on-call for pediatric pulmonology and assumed care of Jabaris. On April 15, 2003, Dr. Hudson released Jabaris from MCG with orders for him to have a follow-up appointment with Dr. Megow the next day and to schedule a follow-up appointment with Dr. Guill at the pediatric pulmonology clinic MCG operated in Valdosta. Jabaris returned home on April 15 and died suddenly the following morning. An autopsy revealed that Jabaris most likely died of cardiac arrest caused by idiopathic, dilated cardiomyopathy (an asymptomatic, enlarged heart).

Following the death of their son, the Porters filed the underlying lawsuit against Dr. Megow, Dr. Guill, the Medical College of Georgia Foundation d/b/a the Medical College of Georgia Hospital, and Susan Wade, M.D., asserting claims for medical negligence, breach of contract, breach of warranty and of guaranty of cure, and wrongful death. The trial court subsequently granted the Porters' motions to dismiss with prejudice their claims against the MCG Hospital and Dr. Wade. Dr. Megow and Dr. Guill then filed separate motions for summary judgment as to the claims asserted against each by the Porters.

After a hearing on both motions, the trial court entered an order on April 2, 2008 denying Dr. Megow's motion, finding that material issues of fact existed with respect to her liability in Jabaris's death. On April 21, 2008, the trial court entered an order granting summary judgment in favor of Dr. Guill on all claims asserted against her by the Porters, finding that Dr. Guill was entitled to official immunity for any liability arising from her treatment of Jabaris. The Porters thereafter filed a notice of appeal from the April 21, 2008 order, and Dr. Megow filed a timely notice of cross-appeal from the April 2, 2008 order.

SGMC on April 11 to await that transfer, to allow Mrs. Porter to make arrangements for her other children so that she could accompany Jabaris to Augusta.

## Case No. A09A0028

In Case No. A09A0028, the Porters appeal the order of summary judgment entered in favor of Dr. Guill, arguing that the trial court erred in holding that Dr. Guill was entitled to official immunity under the Georgia Tort Claims Act, OCGA § 50-21-20 et seq. That statute provides official immunity to any state employee "who commits a tort while acting within the scope of his or her official duties or employment. . . ." OCGA § 50-21-25 (a). On appeal, the Porters do not dispute that Dr. Guill was a state employee who treated Jabaris in her position as a physician and faculty member at MCG. Rather, they argue that the Supreme Court of Georgia's decision in *Keenan v. Plouffe*[3] demonstrates that Dr. Guill's medical treatment of Jabaris fell outside the scope of her official duties as a staff physician and faculty member at MCG. They further argue that, in light of *Keenan*, granting official immunity to Dr. Guill would violate the Porters' constitutional rights to due process and equal protection. We disagree and find that the trial court properly interpreted and applied the law in holding that Dr. Guill was entitled to official immunity for any liability arising from her treatment of Jabaris. We further find that such immunity does not violate the Porters' constitutional rights to due process and equal protection.

1. The first issue we must address is whether *Keenan* requires us to hold that Dr. Guill's medical treatment of Jabaris fell outside the scope of her official duties as a state employee. We find that it does not.

In *Keenan*, the Supreme Court of Georgia ruled that a physician and faculty member at MCG was not acting within the scope of his state employment when he performed surgery on a "private-pay" patient — i.e., a patient whose treatment was funded by a third-party, private insurer. 267 Ga. at 793 (1). Specifically, the court found that the physician was not acting within the scope of his official duties because: (1) the patient was not one the physician was obligated to treat by virtue of his position as a faculty member at MCG, but was instead a private-pay patient that had employed the physician directly (id. at 793 (2)); (2) the physician's treatment of the patient was left "to his sole medical discretion" and therefore "[did] not call into play what might be termed 'governmental consider- ations,' such as the allocation of state resources for various types of medical care" (id.); and (3) there was no evidence that the legislature intended to extend immunity to state-employed physicians treating private-pay patients. Id. at 795 (3).

---

[3] *Keenan v. Plouffe*, 267 Ga. 791 (482 SE2d 253) (1997).

The *Keenan* Court, however, was careful to limit its holding on official immunity to the facts of that case, noting:

> Because this case involves the exercise of a medical discretion on a private-pay patient that was not controlled by the government employer or by statute, we do not consider whether immunity is appropriate for state-employed physicians who are required to treat particular patients, or who are alleged to have violated governmental, as opposed to medical, responsibilities, or whose medical discretion is controlled or impacted by governmental standards or constraints.

Id. at 796 (3), n. 17.

Here, it is undisputed that Jabaris was not a private-pay patient. Rather, as a Medicaid patient, his treatment was funded by public money. As the parties acknowledge, therefore, *Keenan* expressly left open the question we are now confronted with: whether a state-employed physician is entitled to official immunity from medical malpractice actions brought by patients whose treatment is paid for by public funds. Considering the same factors analyzed by the Supreme Court in *Keenan*, we find that Dr. Guill's treatment of Jabaris fell within the scope of her duties as a faculty member at MCG.

(a) First, it appears that Jabaris was a patient Dr. Guill was obligated to treat in her capacity as a faculty member at MCG. The record reflects that Jabaris was referred to the pediatric pulmonology department at MCG, as opposed to being referred to Dr. Guill specifically. While Dr. Megow may have contacted Dr. Guill's office about admitting Jabaris to MCG, that contact occurred because Dr. Guill was a faculty member at MCG. Moreover, the undisputed testimony was that Dr. Megow spoke with Dr. Guill at the time of Jabaris's referral to MCG because Dr. Guill was the on-call physician for the pediatric pulmonology department. This situation is in marked contrast to *Keenan*, where it appeared that the patient had sought out the specific physician, instead of a specific facility.

Dr. Guill's testimony also showed that she treated Jabaris as part of her job as an MCG faculty member. Dr. Guill explained that she received one salary from MCG, which compensated her for all her responsibilities as a faculty member. Those responsibilities included both classroom teaching duties and clinical duties — i.e., the treatment of patients. Clinical duties represented 50% of Dr. Guill's faculty duties at MCG and those duties also involved a teaching aspect. The care of pediatric pulmonology patients admitted to MCG was done by a team of physicians, with the treating physician/faculty

member serving as the lead physician, and the other members of the team being a first-year resident, a third-year resident, and a medical student. In this case, the doctor who did the initial examination of Jabaris upon his arrival at MCG and who took the medical history from the mother was a third-year resident, with Dr. Guill then conducting her own examination and reviewing the resident's findings. Throughout Dr. Guill's tenure as Jabaris's treating physician at the hospital, examinations were performed by all members of the team, with Dr. Guill then reviewing the results of those examinations and performing her own. Thus, Dr. Guill's treatment of Jabaris was a part of, as opposed to distinct from, her duties as a faculty member at MCG. See *Green v. Central State Hosp.*[4] (physician, employed through MCG as prison medical director, was acting within scope of employment in treating prisoner); *Keenan*, supra, 267 Ga. at 799 (2) (noting that teaching in a hospital setting represents an integral part of the public education function performed by MCG) (Benham, C. J., dissenting).

(b) Second, given that Jabaris was a Medicaid patient, Dr. Guill's decisions on how to treat him necessarily called into play considerations as to the allocation of the government's medical resources. Additionally, physicians and hospitals that treat Medicaid patients are bound by certain treatment guidelines and other regulations that logically have some impact on their medical discretion.[5] See, e.g., OCGA § 49-4-142 et seq.; Ga. Comp. R. & Regs. r. 350-1-.01 et seq.; 42 CFR § 441.12 (Medicaid coverage for inpatient hospital tests); 42 CFR § 441.17 (laboratory services).

(c) Finally, *Keenan* found that the legislature did not intend to extend official immunity to state-employed physicians treating private-pay patients. 267 Ga. at 796 (3). We find, however, that the legislature did intend to provide immunity to state-employed physicians who, as part of their duties, treat indigent or Medicaid patients. This intent is evidenced by the legislature's 2005 enactment of the Volunteer Health Share Act, OCGA § 31-8-191 et seq., which provides immunity to healthcare providers in private practice who treat such patients.[6] We conclude that, in enacting this law, the legislature was extending to private physicians the immunity it had already provided to state-employed physicians treating indigent and Medi-

---

[4] *Green v. Central State Hosp.*, 275 Ga. App. 569, 572 (2) (621 SE2d 491) (2005).

[5] These guidelines and regulations address things such as the number, nature, and timing of tests that may be run and be subject to reimbursement, the length of a covered hospital stay, and when treatment by a resident or an intern in a teaching hospital will be covered.

[6] Given that Dr. Megow's treatment of Jabaris occurred prior to the enactment of this statute, the question of whether she would be entitled to immunity under the same is not at issue.

caid patients.[7]

2. The Porters also assert that a grant of official immunity to Dr. Guill based upon Jabaris's status as a Medicaid patient would violate their constitutional rights to due process and equal protection. The Supreme Court of Georgia, however, has previously rejected the argument that the Georgia Tort Claims Act violates the constitution, even where it does not afford equal treatment to all plaintiffs. As the Court explained:

> The bar of sovereign immunity neither results in a deprivation of property without just compensation nor constitutes a denial of equal protection or due process under the federal or state constitutions. The due process and equal protection clauses of the federal and state constitutions protect only rights, not mere privileges, and discrimination in the grant of privileges is not a denial of equal protection to those who are not favored. A waiver of sovereign immunity is a mere privilege, not a right, and the extension of that privilege is solely a matter of legislative grace.

(Citations and punctuation omitted.) *Riddle v. Ashe*.[8] Accordingly, "[a]ny remedy for . . . unequal treatment [resulting from official immunity] lies with the General Assembly rather than the courts." *Woodard v. Laurens County*.[9] See also *Sheley v. Bd. of Public Ed. &c.*[10] ("[t]he immunity rule now has constitutional status, and solutions to the inequitable problems that it has posed and continues to pose must now be effected by the General Assembly").

### Case No. A09A0029

3. In Case No. A09A0029, Dr. Megow appeals from the trial court's order denying her motion for summary judgment, arguing that the trial court erred in finding that the evidence was sufficient

---

[7] We also note that *Keenan* found that "the purpose of official immunity is not furthered by construing the phrase 'official duties' to encompass the exercise of medical discretion with regard to private-pay patients," because "liability insurance is readily available for medical doctors who treat private-pay patients. *Thus, immunity is not necessary to encourage doctors to treat their patients or to protect their assets*." (Emphasis supplied.) 267 Ga. at 796 (3). In passing the Volunteer Health Share Act, however, the legislature found that official immunity is necessary to encourage physicians to treat uninsured, indigent, or Medicaid patients. The statute contains an express legislative finding "that a significant proportion of the residents of this state who are uninsured or Medicaid recipients are unable to access needed health care because health care providers fear the increased risk of medical negligence liability." OCGA § 31-8-191.

[8] *Riddle v. Ashe*, 269 Ga. 65, 67 (3) (495 SE2d 287) (1998).

[9] *Woodard v. Laurens County*, 265 Ga. 404, 406 (1) (456 SE2d 581) (1995).

[10] *Sheley v. Bd. of Public Ed. &c.*, 233 Ga. 487, 488 (212 SE2d 627) (1975).

to create a question of fact on the issue of whether her alleged negligence was a cause of Jabaris's death. We disagree, and therefore affirm the trial court's order.

To recover in a medical malpractice case, a plaintiff must demonstrate, by expert testimony, "a violation of the applicable medical standard of care [and] also that the purported violation [of] or deviation from the proper standard of care is the proximate cause of the injury sustained." (Punctuation omitted.) *MCG Health v. Barton*.[11] The plaintiffs' expert clearly opined in an affidavit that the failure on the part of all of the treating doctors to evaluate the child's cardiac condition caused the child's death. In his deposition, the expert specifically averred that his opinions had not changed in any major way and he detailed the minor adjustments in his allegations of negligence, none of which wholly exonerated Dr. Megow. Even if the expert's deposition did contradict some aspects of the affidavit and did purport to exonerate Dr. Megow, "an affidavit of a physician that establishes the necessary causal link in terms of probability or reasonable medical certainty, even though later contradicted by that physician in deposition testimony, is sufficient to withstand a summary judgment motion on the issue of causation." *Rodrigues v. Ga.-Pacific Corp.*[12]

Construed in favor of the plaintiffs, the evidence with regard to Dr. Megow shows that Jabaris died as a result of "a previously undetected and untreated dilated cardiomyopathy which most likely caused a fatal terminal cardiac arrhythmia." Dilated cardiomyopathy is a disease of the heart muscle. In addition to his respiratory symptoms, the child had for weeks exhibited isolated tachycardia which is an indication of possible dilated cardiomyopathy. An echocardiogram test gives the diagnosis "virtually a hundred percent of the time." It is undisputed that Dr. Megow never referred Jabaris to a cardiologist or ordered an echocardiogram. Specifically, Dr. Megow admitted that she never considered his cardiac function to be abnormal, that she never considered referring the child to a pediatric cardiologist, that she never ordered tests to rule out heart disease, and that she specifically referred the child to the pulmonology department of MCG.

In his affidavit, the plaintiffs' expert opined that Dr. Megow's actions fell below the standard of care in several ways: (1) she failed to pursue evaluation of the child's heart murmur and relative tachycardia in the face of a history of persistent presenting symptoms; (2) she failed to consult a cardiologist in the face of the same

---

[11] *MCG Health v. Barton*, 285 Ga. App. 577, 582 (647 SE2d 81) (2007).
[12] *Rodrigues v. Ga.-Pacific Corp.*, 290 Ga. App. 442, 445-446 (661 SE2d 141) (2008).

symptoms; (3) she failed to diagnose the child's dilated cardiomyopathy; (4) she discharged the child without having diagnosed, treated or managed his dilated cardiomyopathy; (5) she failed to pursue evaluation of the child's persistent, recalcitrant wheezing which can be a sign of heart disease in young infants; and (6) she failed to appropriately diagnose, treat and manage the infant's serious health condition, namely, dilated cardiomyopathy.

He also opined that this failure to evaluate the child's cardiac condition caused the child's death:

> In my opinion, based on a reasonable medical probability, had appropriate evaluation and consultation been performed prior to discharge, the infant's dilated cardiomyopathy would have been diagnosed and appropriate management undertaken. Cardiac intervention, based on a reasonable medical probability, would have prevented his fatal cardiac arrhythmia.

In his deposition, the expert noted that he had received additional medical records just prior to his deposition, which was over two years after his affidavit. In these documents, the expert learned that the child had experienced additional episodes of tachycardia at SGMC. But the expert specifically testified that his opinions had not changed from those given in the affidavit in any major way. Rather, he testified only as to some minor changes, none of which wholly exonerated Dr. Megow.[13]

In the end, the expert repeatedly stressed that he criticized Dr. Megow for failing to take action in the face of the unexplained tachycardia. He stated that Dr. Megow's actions in taking the child to SGMC were good steps to take in the face of the child's continuing respiratory problems, but the expert never backed off of Dr. Megow's failure to take action on the tachycardia. He found no indication in the medical records to show that Dr. Megow recognized the tachy-

---

[13] For example, the expert clarified that when he criticized the doctors' failure to consult a cardiologist or diagnose the actual problem, he should have added that they could have ordered an echocardiogram instead – they had to "recognize the physical abnormality and take steps to do cardiac evaluation, either themselves or by having a cardiology consultation." He also added that the tachycardia was a more important symptom than the heart murmur for the purposes of deciding that additional testing should have been done. With regard to his assertion that the doctors discharged the child without having diagnosed the condition, he clarified that reaching a diagnosis at this point was not critical but recognizing a heart problem and getting more testing was. He explained that the discharge was otherwise inappropriate because of the tachycardia and the overall poor condition of the baby at that time. But he admitted that Dr. Megow was not involved with the decision to discharge the child from MCG, so he withdrew his allegation on that point. Finally, he backed away from the allegation about Dr. Megow's failure to pursue evaluation of the child's persistent, recalcitrant wheezing.

cardia as an abnormality on its own or in combination with the child's respiratory distress. He stated, "the issue is the tachycardia was never identified as a problem. . . . I think she had to recognize it as a problem, is the main thing." She needed to recognize the symptom as outside the range of normal. "[S]he needed to identify it as a problem, and pass that problem on to the next group of people so that determination could be made." He repeatedly stressed that Dr. Megow's medical notes were devoid of any mention of or consideration of the tachycardia, and that "the standard of care mandates identification of the problem, a discussion, and differential diagnosis, and an impression." He noted that a high heart rate listed in the physical examination of the child is not the same as forming a medical impression that the child had a tachycardia problem. He also explained that part of the trouble was the progressive nature of the tachycardia problem. It had been increasing over a period of weeks at a time when the baby's heart rate should have been going down with age. In the expert's words: "So you have an increasing heart rate over that period of time that needed to be recognized and was not recognized." "[T]hat mandates some kind of evaluation to rule out cardiac disease."

Finally, the expert was asked, given that MCG had information about the tachycardia on the child's medical records, whether was there anything else that Dr. Megow should have told MCG about the child. The expert said that she should have described it as a separate problem.

The expert was then asked if Dr. Megow's failure caused or contributed to the child's death. He replied:

> I do think that there was the potential to stimulate further investigation by the people at [MCG], if that had been identified for them. Is it directly related to his cause of death, probably not.

He went on to explain:

> When I say that it was not a cause of death, the reason it was not, her failure to deliver care was not related to the cause of death was because she was referring the child for a next level consultation. . . . If that consultation had not occurred, I would say otherwise. . . . But with that consultation as background, I think probably this cannot be attributed as a cause of death.

He never suggested that his conclusion regarding causation had changed. Nor did he attribute the above response to any of the

information he had seen for the first time just prior to the deposition. Moreover, to the extent that the expert's response to the question regarding cause of death is contrary to his affidavit, the rule in *Rodrigues*, supra, 290 Ga. App. at 445-446, is directly applicable, and the contradiction cannot be used to support summary judgment. To allow the mere suggestion that new documents are a basis for ignoring the expert's affidavit would open the door to endless litigation on this point. Compare *Cannon v. Jeffries*.[14]

In short, the expert's limited and ambiguous deposition testimony regarding negligence and causation was not a basis on which to ignore his affidavit testimony in which he opined that based on a reasonable medical probability, proper evaluation and consultation of the child's heart problem would have prevented the child's death. Such affidavit testimony raised an issue of fact, which precluded summary judgment.

For the reasons set forth above, we affirm the trial court's order in Case No. A09A0028, granting Dr. Guill's motion for summary judgment on the grounds that she is entitled to official immunity from any liability arising from her treatment of Jabaris. We also affirm the trial court's order in Case No. A09A0029, denying Dr. Megow's motion for summary judgment as to the Porters' claims against her, because we find that the trial court correctly concluded that there existed a material issue of fact on the issue of Dr. Megow's liability.

*Judgment affirmed in both cases. Adams and Doyle, JJ., concur.*

DECIDED JULY 8, 2009.

*Carl G. Fulp III, Kevin R. Dean*, for Porter.

*Weinberg, Wheeler, Hudgins, Gunn & Dial, Carol P. Michel, Shubhra R. Mashelkar, Owen, Gleaton, Egan, Jones & Sweeney, Annarita M. Busbee*, for Guill et al.

---

[14] *Cannon v. Jeffries*, 250 Ga. App. 371, 372-373 (1) (551 SE2d 777) (2001).