## A11A1363. JONES et al. v. ALLEN et al.

### (720 SE2d 1)

MILLER, Presiding Judge.

Kenneth Jones and Clara Ramon, individually and as parents and next friends of their minor son M. J. (collectively, the "Joneses"), filed a medical malpractice action, seeking damages and a declaratory judgment related to the allegedly negligent treatment their child received as a patient at the Medical College of Georgia Children's Medical Center ("MCG"). The named defendants included M. J. Allen, D.O.; Prem Singh Shekhawat, M.D.; and Wayne Mathews, M.D. Dr. Allen moved to dismiss the complaint on the ground that she was entitled to official immunity as a state employee, and Dr. Shekhawat and Dr. Mathews filed separate motions for summary judgment on the same basis.

Following a hearing, the trial court granted Dr. Allen's motion to dismiss, and granted Dr. Shekhawat's and Dr. Mathews's motions for summary judgment, finding that they were entitled to qualified immunity. The Joneses appeal, challenging both of the foregoing rulings by the trial court. For the reasons set forth below, we affirm in part and reverse in part.

> We review a trial court's order dismissing a plaintiff's complaint de novo. . . . A motion to dismiss asserting sovereign immunity . . . is based upon the trial court's lack of subject matter jurisdiction, rather than the merits of the plaintiff's claim. See OCGA § 9-11-12 (b) (1). The party seeking to benefit from the waiver of sovereign immunity has the burden of proof to establish waiver, and the trial

court's pre-trial ruling on factual issues necessary to decide the OCGA § 9-11-12 (b) (1) motion is reviewed on appeal under the any evidence rule.

(Citations, punctuation and footnotes omitted.) *Bonner v. Peterson*, 301 Ga. App. 443 (687 SE2d 676) (2009).

We also review the grant of summary judgment de novo, construing the facts and all inferences drawn from them in the light most favorable to the nonmoving party. See *Ins. Co. of Pa. v. APAC-Southeast*, 297 Ga. App. 553 (677 SE2d 734) (2009). Summary judgment is appropriate if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[.]" OCGA § 9-11-56 (c).

The record evidence shows the following. On December 28, 2003, MCG received a call from another hospital requesting a transfer of M. J. based on a life-threatening condition. Dr. Shekhawat, a faculty member at MCG and the attending neonatologist at MCG, directed a transport team to bring M. J. to the medical center. Dr. Shekhawat personally treated M. J. upon his arrival and also supervised Dr. Allen, then a second-year resident fellow, in her follow-up treatment of M. J.

While at MCG, M. J. underwent surgery. Dr. Mathews, a MCG faculty member, was contacted as the on-call anesthesiologist to assist in M. J.'s surgery. Prior to surgery, M. J. was intubated by a resident anesthesiologist under the supervision of Dr. Mathews. Following surgery, Dr. Mathews and the resident anesthesiologist delivered M. J. to the Neonatal Intensive Care Unit ("NICU"), and the resident anesthesiologist reported to the NICU staff that M. J.'s endotracheal tube was not secure. While he was in the NICU, M. J. had to be re-intubated by medical personnel, including Dr. Allen, on two separate occasions. At one point during his recovery, M. J.'s heart rate dropped, and he needed emergency life preserving measures that were initially directed by Dr. Allen and then later by Dr. Shekhawat. Those measures were successful, and M. J.'s condition stabilized. The Joneses sued the physician defendants, alleging that their negligence in ensuring that M. J. was adequately oxygenated during intubation resulted in his permanent disability.

1. The Joneses contend that the trial court erred in finding that Dr. Shekhawat and Dr. Mathews were entitled to official immunity, because there was a genuine issue of material fact as to whether the physicians were acting within the scope of their state employment at MCG when they treated M. J. based on the factors listed in *Keenan v. Plouffe*, 267 Ga. 791 (482 SE2d 253) (1997). We agree and reverse the trial court's grant of summary judgment as to the Joneses' claims

against Dr. Shekhawat and Dr. Mathews.

Except as provided in the Georgia Tort Claims Act ("GTCA"), "officers and employees of the state or its departments and agencies shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official actions." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d). Under the GTCA, state employees are entitled to qualified immunity for torts committed while acting within the scope of their official duties or employment. See OCGA § 50-21-25 (b).

> In *Keenan*, the Supreme Court of Georgia ruled that an attending physician and faculty member at MCG was not acting within the scope of his state employment when he performed surgery on a "private-pay" patient — i.e., a patient whose treatment was funded by a third-party, private insurer. . . . [T]he court reasoned that the attending physician was not acting within the scope of his official duties because: (i) the patient was not one the attending physician was obligated to treat by virtue of his position as a faculty member at MCG, but was instead a private-pay patient who had employed the attending physician directly; (ii) the patient was billed separately for the professional services of the attending physician through an entity other than MCG; (iii) this same entity provided the attending physician with compensation, in the form of fringe benefits and professional liability insurance, that was separate from and in addition to the compensation he received in his capacity as a faculty member at MCG; (iv) the attending physician's treatment of the patient was left to his sole medical discretion; and (v) the allegations of negligence related solely to the attending physician's independent medical judgment in treating the patient.

(Citations, punctuation and footnotes omitted.) *Bonner*, supra, 301 Ga. App. at 450 (2) (b).

Here, as the moving parties, Dr. Shekhawat and Dr. Mathews did not establish that they were entitled to qualified immunity, as the record evidence establishes that the circumstances are similar to those present in *Keenan*. As in *Keenan*, it is undisputed that M. J. was a private-pay patient. The record evidence also shows that M. J. was billed separately for the professional services of Dr. Shekhawat through an entity other than MCG — namely, Physicians Practice Group ("PPG") — and Dr. Mathews testified that the billing for his anesthesia services ultimately went to PPG. See *Keenan*, supra, 267 Ga. at 792, 793 (2). While PPG did not employ faculty members, it

did provide fringe benefits to and purchased professional liability for its member physicians, including Dr. Shekhawat and Dr. Mathews. Id. Dr. Shekhawat and Dr. Mathews did not establish that their treatment of M. J. was controlled by the government or "call[ed] into play what might be termed governmental considerations," as opposed to being left to their sole medical discretion. *Keenan*, supra, 267 Ga. at 793 (2).

Dr. Shekhawat and Dr. Mathews assert that they were entitled to qualified immunity because the evidence showed that they were acting within the scope of their employment as MCG faculty based on their obligations to treat patients and to supervise and train residents and fellows in providing treatment to patients. As stated in *Keenan*, however, "although it could be argued that [Dr. Shekhawat and Dr. Mathews were] in the broadest sense acting within the scope of [their] employment because [they] had an obligation as . . . professor[s] at [MCG] to treat patients," they also may have had distinct obligations to M. J. that were independent of their official state duties. (Punctuation omitted.) *Keenan*, supra, 267 Ga. at 793 (2). Similarly, to the extent Dr. Shekhawat and Dr. Mathews rely on this Court's decision in *Porter v. Guill*, 298 Ga. App. 782 (681 SE2d 230) (2009), to support their claim that they were entitled to qualified immunity, *Porter* is distinguishable. Unlike here, *Porter* did not involve a private-pay patient, and the MCG physician's medical discretion was impacted by Medicaid guidelines and regulations that "necessarily called into play considerations as to the allocation of the government's medical resources." *Porter*, supra, 298 Ga. App. at 787 (1) (b). Moreover, while the Joneses did not seek out either physician for treatment, "[a]t the point when [they] agree[d] to treat or operate on [M. J.] . . . the relationship [became] the personal and confidential one of a doctor and patient, not the [state] and patient." (Punctuation omitted.) *Keenan*, supra, 267 Ga. at 794 (2). Notwithstanding Dr. Shekhawat's and Dr. Mathews's official duties as MCG faculty members, when they acted as physicians, their primary duty was to M. J., rather than to the state. See, e.g., *Howard v. City of Columbus*, 239 Ga. App. 399, 415 (4) (521 SE2d 51) (1999) (holding that a jail medical director was not entitled to qualified immunity when he treated a patient as a physician); *Jackson v. Miller*, 176 Ga. App. 220, 221 (1) (335 SE2d 438) (1985) (holding that a physician was not entitled to qualified immunity simply by virtue of his employment by a public clinic, because his primary duty as a physician was to his patient, rather than the state or the city). Based on the foregoing, as the parties moving for summary judgment based on qualified immunity, Dr. Shekhawat and Dr. Mathews did not establish that there were no genuine issues of material fact in this regard, and therefore, we reverse the trial court's grant of summary

judgment in their favor.[1]

2. The Joneses also contend that the trial court erred by extending the holdings in *Bonner* and *Nelson v. Bd. of Regents &c.*, 307 Ga. App. 220 (704 SE2d 868) (2010), to conclude that Dr. Allen was entitled to qualified immunity. The Joneses argue that the holding of these cases — that MCG resident physicians are entitled to qualified immunity — should not be extended to Dr. Allen, who was a fellow, rather than a resident, at the relevant time. We disagree.

Significantly, in *Bonner*,

the record show[ed] that resident physicians, unlike attending physicians, are subject to the control and direction of others. Specifically, resident physicians work under and are supervised by attending physicians. They have no hospital privileges and they are not empowered to make any unilateral decisions regarding the treatment of patients. Patients do not make appointments with resident physicians and residents have no control over which patients they see. Instead, resident physicians treat patients who are also being treated by an attending physician. Additionally, unlike attending physicians, resident physicians receive no compensation, either directly or indirectly, from any patient. Rather their only compensation is paid by MCG, and that compensation does not vary based upon either the number of patients seen or the number of procedures performed.

*Bonner*, supra, 301 Ga. App. at 451 (2) (b); *Nelson*, supra, 307 Ga. App. at 230 (3) (quoting same); see also *Gargiulo v. Ohar*, 239 Va. 209, 211, 215 (V) (387 SE2d 787) (1990) (holding that a licensed, board-certified physician employed as a fellow in a state-run research program was entitled to official immunity from liability arising out of treatment she provided to patients during the course of her fellowship, because, like here, she received no compensation from patients, was not allowed to choose or refuse patients, and was under the supervision of attending physicians); *DeRosa v. Shands Teaching Hosp. &c.*, 504 S2d 1313, 1314-1315 (Fla. Dist. Ct. App. 1987) (holding that fellows were entitled to sovereign immunity as a defense against medical malpractice claim based on fellows' assistance during an operation as physicians in training).

Here, the record evidence showed that, during the relevant time,

---

[1] Given this conclusion, we need not consider the Joneses' alternative arguments on appeal.

Dr. Allen was employed by MCG as a second-year fellow in MCG's Graduate Medical Education Program, and was training under the general supervision of attending physicians. As a fellow, she had already completed her three-year residency program, and her duties included assisting physicians who treated patients at the MCG hospital. She was not afforded hospital privileges, and she was only able to work under the supervision of attending physicians who had such privileges. She was not permitted to choose which patients to treat, and patients could not choose to be treated by her. In fact, Dr. Allen did not have a direct "doctor-patient" relationship with any patients treated at MCG. Nor did she have a private-pay relationship with M. J. or any other patient, and her pay was limited to a fixed stipend set by the number of years she completed in her fellowship, not the number of patients she treated or procedures she performed.

Based on the foregoing, we conclude that *Bonner* and *Nelson* apply, because the circumstances presented in those cases are substantially similar to those involved in this case. See *Bonner*, supra, 301 Ga. App. at 451 (2) (b); *Nelson*, supra, 307 Ga. App. at 230 (3). To the extent the Joneses argue that we should treat a fellow more like an attending physician and less like a resident, we are not persuaded. First, while the Joneses assert that Dr. Allen was unlike a resident because she was a licensed physician, we have previously noted that resident physicians are "at least provisionally licensed to practice medicine." (Citation omitted.) *Bonner*, supra, 301 Ga. App. at 449 (2) (a); see also *Nelson*, supra, 307 Ga. App. at 229 (3), n. 37. Second, the Joneses' assertion that Dr. Allen exercised "unilateral" decision-making authority when she intubated M. J. and performed other procedures outside of the attending physician's presence is without merit. The evidence established that, as a fellow, Dr. Allen was operating under the general supervision of an attending physician. See *Bonner*, supra, 301 Ga. App. at 444.

There is also no merit to the claim that Dr. Allen was not a state employee. MCG developed a formal employment contract with Dr. Allen, approved her leave requests, and controlled her work rotations. Additionally, Dr. Allen was paid by MCG. The Joneses nevertheless argue that "every aspect of Dr. Allen's pay, benefits, and work-related expenses were funded 100% by . . . MCGHI."[2] Aside from assuming responsibility for funding educational programs from outside sources,[3] the Joneses cite to no provision that MCGHI

---

[2] MCG Health, Inc. (or "MCGHI") was a nonprofit organization that assumed operational control of MCG hospitals through a lease agreement with the Board of Regents, a public body of the State of Georgia that had operated the hospital until July 2000. See *MCG Health, Inc. v. Nelson*, 270 Ga. App. 409, 410 (606 SE2d 576) (2004).

[3] The Joneses' brief misquotes the provisions in which MCGHI agreed to support MCG

assumed total responsibility for funding all of MCG's educational programs. Nor did MCGHI "fund" Dr. Allen's position, but rather reimbursed MCG in full for the actual costs of MCG's Housestaff services, including those of Dr. Allen. Based on the foregoing, Dr. Allen was an employee of MCG, and was not an employee or agent of MCGHI. See *Johnson v. American Nat. Red Cross*, 253 Ga. App. 587, 594 (4) (569 SE2d 242) (2002) (providing that the true test of an employer-employee relationship is whether the employer controls the time, manner, or method of executing the work).

Contrary to the Joneses' suggestion, MCG's decision to enter into a lease agreement with MCGHI did not somehow operate to waive immunity for Dr. Allen in light of the General Assembly's intent to provide her with official immunity that cannot be waived by the state actors. See *Norton v. Cobb County*, 284 Ga. App. 303, 307 (2) (643 SE2d 803) (2007) (citing Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d)); see also *Butler v. Carlisle*, 299 Ga. App. 815, 818-819 (1) (683 SE2d 882) (2009) (holding that an intergovernmental agreement, by itself, did not operate as a waiver of sovereign immunity). Moreover, MCG expressly stated that nothing in the lease agreement or associated agreements would "be deemed to waive any immunity or protection of [the Board of] Regents, any [i]ndemnitee, or any other entity of the State of Georgia, including, without limitation, the protections of the Georgia Torts Claims Act[.]"[4]

Finally, we have previously rejected the argument made here that Dr. Allen should not be granted official immunity because she was covered by liability insurance. See *Nelson*, supra, 307 Ga. App. at 231 (3).

> While it is true that Ga. Const. of 1983, Art. I, Sec. II, Par. IX previously waived sovereign immunity to the extent that liability insurance was provided, this provision was amended, effective January 1, 1991, to delete the insurance-waiver clause, and to instead provide that the extent of the state's waiver of sovereign immunity was provided under the GTCA. Because [the Joneses'] action accrued after January 1, 1991, the insurance waiver of sovereign immunity does not apply.

(Footnotes omitted.) Id. Accordingly, Dr. Allen was entitled to official

---

in funding clinical education programs. Contrary to the Joneses' claim, the record reflects that MCGHI agreed to fund such programs to the same extent MCG did prior to the transfer date and only "to the extent that [it] receive[d] funding earmarked for such programs from any source."

[4] "Indemnitees" was defined to include all students and employees of the Regents.

immunity, and we affirm the trial court's decision to grant her motion to dismiss on this basis.

*Judgment affirmed in part and reversed in part. Ellington and Doyle, JJ., concur.*

*Blasingame, Burch, Garrard & Ashley, Josh B. Wages*, for appellants.

*Owen, Gleaton, Egan, Jones & Sweeney, Annarita M. Busbee, Derrick L. Bingham, Carlock, Copeland & Stair, Adam L. Appel, Kim M. Ruder, Rutherford & Christie, Vincent A. Toreno*, for appellees.