**FOURTH DIVISION**
**DOYLE, P. J.,**
**MCFADDEN and BOGGS, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 15, 2013**

# In the Court of Appeals of Georgia

A13A0601. COOK v. FORRESTER.

A13A0602. WYNN v. FORRESTER.

BOGGS, Judge.

In this medical malpractice action, James Wynn, M. D., and Lloyd Cook, M. D., appeal from the trial court's orders denying their claim of official immunity provided by the Georgia Tort Claims Act, OCGA § 50-21-1 et seq. In their sole enumeration of error on appeal, they contend that the trial court erred by concluding that our recent opinion in *Jones v. Allen*, 312 Ga. App. 762 (720 SE2d 1) (2011), precludes a finding of immunity. Based upon the Supreme Court of Georgia's recent decision in *Shekhawat v. Jones*,___ Ga.___ (Case No. S12G0552, decided July 11, 2013), we reverse.

The party seeking to benefit from the doctrine of official immunity has the burden of proof. See *Howell v. Willis*, 317 Ga. App. 199, 203 (729 SE2d 643) (2012). The trial court's ruling on a motion to dismiss is reviewed de novo, while factual findings are sustained if there is evidence supporting them. *Southerland v. Ga. Dept. of Corrections*, 293 Ga. App. 56, 57 (666 SE2d 383) (2008).

The record shows that Charlotte Forrester's treating physician referred her to the Kidney Transplant Program at the Medical College of Georgia hospital. During a surgery to remove both her kidneys that was scheduled several weeks before Mrs. Forrester was to receive a donated kidney from her sister,[1] Mrs. Forrester's spleen was injured and the doctors performing the surgery, Dr. James Brown and Dr. Jeremiah Murphy, ordered blood transfusions. The blood provided to Mrs. Forrester during these transfusions was not leukoreduced and she subsequently "developed antibodies against her sister," resulting in the cancellation of her scheduled transplant. At some point after the transplant of her sister's kidney at another hospital and over a year after the surgery in which her kidneys were removed at the Medical College of Georgia hospital, Mrs. Forrester died. At the time Mrs. Forrester's kidneys were

---

[1] The purpose of the surgery was to prevent an infection from occurring before the scheduled transplant.

removed, the Medical College of Georgia did not have any policies in place to ensure that transplant patients receive leukoreduced blood.

Following Mrs. Forrester's death, John Forrester, as executor of the estate sued the Board of Regents of the University System of Georgia, the Board of Regents of the University System of Georgia d/b/a Medical College of Georgia Hospitals and Clinics ("MCG"), MCG Health, Inc. ("MCGHI"), the doctors who performed the surgery to remove Mrs. Forrester's kidneys (Dr. Brown and Dr. Murphy), as well as the director of the blood bank (Dr. Lloyd Cook), and the director of the renal transplant program (Dr. James Wynn).[2] The plaintiff's amended complaint asserts that Drs. Cook and Wynn

> were employees of the Defendant Board of Regents of the University System of Georgia, Board of Regents of the University System of Georgia, d/b/a Medical College of Georgia Hospitals and Clinics, and/or were agents of the Defendant MCG Health, Inc., and each of said Defendants care and treatment of Charlotte Forrester was within the scope of their employment

---

[2] Mr. Forrester subsequently dismissed his claims against Dr. Brown and Dr. Murphy without prejudice.

with each of these entities. It also contends that the doctors "exercised discretion not controlled by policies of the defendant Board of Regents, and had independent obligations to the Plaintiff and Charlotte Forrester that were independent of official state duties. Said Defendants are also individually liable for the professionally negligent performance of such acts."

According to the complaint, Dr. Cook and Dr. Wynn's "care and treatment of Charlotte Forrester . . . fell below the standards of care of the medical and hospital professions generally under like or similar circumstances." With regard to Dr. Wynn, the amended complaint alleges:

> As Medical Director and as Administrative Director of the Department of Transplant Surgery, it was the responsibility of [Dr. Wynn] to establish, administer and oversee the solid organ transplant program and the system of services required of such a program at the Medical College of Georgia. Such a system should have included an institution-wide system for immediate identification of the transfusion needs of potential or actual solid organ transplant patients. Further, such a system should have included the provision of leukoreduced blood for potential or actual transplant patient/candidates should the need for transfusion occur. Said Defendant was negligent in his failure to so establish, administer and/or oversee such a system, and such failure was a proximate cause of the sensitization that led to Mrs. Forrester's injuries.

4

The expert affidavits attached to the complaint did not include a contention that Dr. Wynn, in his capacity as Charlotte Forrester's transplant surgeon, committed a negligent act or omission. During depositions of two of the plaintiff's identified expert witnesses (Dr. Snyder and Dr. Hardy), Dr. Wynn's counsel confirmed that their only standard-of-care criticism of Dr. Wynn related to his administrative failures as the medical director of the transplant surgery, *not* his professional care of Charlotte Forrester as an individual patient. Nevertheless, a third plaintiff's expert (Dr. Goodnough) testified that Dr. Wynn violated the standard of care by failing to provide leukoreduced blood to Charlotte Forrester.

With regard to Dr. Cook, the amended complaint asserts:

> [A]s Director of the Blood Bank at the Medical College of Georgia [Dr. Cook] had the professional, medical and administrative responsibility to establish, administer, and oversee the Blood Bank of the Medical College of Georgia (hereinafter "MCG") as an integral part of the transplant program as required by the standards of care of hospitals similarly situated as MCG, including provision of leukoreduced blood for the transfusion needs of patients identified for organ transplant and a system-wide identification system for such patient-candidates. Said Defendant was negligent in his failure to establish, administer and/or oversee such a program, and such failure was a proximate cause of the sensitization that led to Mrs. Forrester's injuries.

Because Dr. Cook was not an attending physician of Mrs. Forrester, it is undisputed that the plaintiff's allegations against Dr. Cook relate solely to his administrative duties as the blood bank director.

Dr. Cook moved to dismiss and Dr. Wynn moved for summary judgment based upon the official immunity provided to a state employee while acting within the scope of their employment under the Georgia Tort Claims Act. OCGA §§ 50-21-25 (a) and 50-21-23 (b). Although the trial court initially granted Dr. Wynn's motion for summary judgment, it subsequently granted the plaintiff's motion for reconsideration and denied Dr. Wynn's motion for summary judgment, as well as Dr. Cook's motion to dismiss.

All of the parties relied upon provisions in several contracts governing the relationship between MCG, MCGHI, the Medical College of Georgia Physicians Practice Group ("PPG"), and member physicians of PPG in support of their positions with regard to the issue of immunity.

The Amended Master Affiliation Agreement between MCG and MCGHI,[3] provides that "MCGHI is committed to supporting [the Board of] Regents Mission,

___

[3] MCGHI is a nonprofit, Section 501 (c) (3) tax-exempt, charitable corporation MCGHI created for the purpose of leasing and operating the hospital.

6

and meeting the health care needs of the State and communities served by the MCG Hospital and Clinics." The agreement provides that the Board of Regents mission "with regard to MCG Hospital . . . is to: (1) educate and train competent health care professionals; (2) provide integrated, comprehensive, and quality health care services; (3) benefit the indigent, near indigent, and paying patients in accordance with OCGA § 20-3-520;[4] and (4) conduct medical and biomedical research." The agreement provided for "the lease and transfer of facilities, assets, employees and obligations of MCG Hospital . . . from Regents to MCGHI in a manner supportive of the public purposes of Regents and MCG Hospital. . . ." The Amended Master Affiliation Agreement also provided that the parties would "execute a Clinical, Educational and Research Service Agreement ('CERSA')." The CERSA agreement provides that "Regents employs all Faculty other than adjunct (clinical) Faculty and is responsible for the allocation of any and all of the professional time and services of employed Faculty Members," and that MCGHI agrees to provide non-physician clinical and support services for the benefit of MCG. . . ."

---

[4] This Code section provides in part: "The board of regents in the exercise of its public and governmental functions shall have power and is authorized to lease, buy, build, construct, contract for the use of, maintain, and operate a general nonprofit teaching hospital at Augusta, Georgia . . . for the benefit of indigent, near indigent, and paying patients . . . ."

7

The Medical College of Georgia Physicians Practice Group, PPG, is a "cooperative organization" of the Board of Regents that handles billing, collecting and disbursement of fees generated by member physician's services, as well as the management of the practice of medicine by MCG. All full-time faculty members of the MCG Hospital are members "by reason of such empoyment." The PPG membership agreement form signed by physicians employed by the Board of Regents expressly provides that the physician "is an employee of the Board of Regents of the University System of Georgia and is not an employee of PPG."

The agreement between PPG and the Board of Regents provides that the Board of Regents "has the authority to determine what portion of a faculty members' time may be devoted to clinical services, medical direction and medical management services," that faculty members "are employees of the Board of Regents," that "[a]ll faculty appointments will be made at the discretion of MCG," that all compensation for MCG faculty will be determined by MCG, and that PPG shall not pay any compensation to MCG faculty other than "fringe benefits in keeping with historical fringe benefit packages."

Based upon these agreements, MCGHI would pay a contractual fee to PPG for the services of MCG faculty who perform administrative roles such as medical

directors of various departments. "PPG in turn pays MCG the fees it receives from MCGHI for the administrative" services, and MCG pays the doctors.

Both doctors pointed to the following evidence in support of their claim that they were acting within the scope of their employment with MCG: they were professors at MCG in addition to their roles as medical directors at the hospital; that only full-time faculty members with MCG can be appointed as medical directors; that a condition of employment with MCG is acceptance of appointments to various positions at facilities operated by MCGHI, including the director of the blood bank; that MCGHI denied that it employed them; that MCG paid them and issued their W-2 tax form; and that their employment contracts were with MCG only.

The plaintiff asserts with regard to both doctors that their negligent conduct arose from their respective roles as medical director for MCGHI, not their employment as faculty members of MCG. In support of this argument, the plaintiff points to the following facts: MCGHI operates the blood bank for MCG; MCGHI appointed Dr. Cook to serve as the Director of the Blood Bank and Dr. Wynn as the Director of Renal Transplant Program for the hospital on an annual basis "via recommendation of MCGHI President/CEO and Chief Medical Officer in consultation with PPG and the Dean of the School of Medicine;" that MCGHI

9

compensated PPG doctors for their services as medical directors; that Dr. Wynn testified in his deposition that he rendered services to MCGHI and that he performed services for MCGHI as the medical director of the renal transplant program; that MCGHI purchased professional liability insurance which would cover the doctors for claims arising out of their administrative duties for MCGHI; and the MCGHI job descriptions specified that their performance as medical directors performance would be evaluated annually by MCGHI and that "[u]nsatisfactory performance may be addressed at any time through the mechanism as described in the PPG/MCGHI agreement." This agreement provided:

> The Medical Administrative Services shall be provided by members of PPG who are also members in good standing of the medical staff of the Component of the Hospital in which such person is providing the Medical Administrative Services. If such person is serving as the chief of a service or as medical director of a unit such person shall have clinical privileges allowing him/her to practice medicine in that service or unit as the case may be. After consultation with PPG and the Dean of the Medical College of Georgia School of Medicine, MCGHI shall appoint the individuals to serve in such positions. If MCGHI is dissatisfied with the performance of any person providing Medical Administrative Services it shall notify PPG in writing summarizing the reasons for its dissatisfaction. PPG shall then consult with MCGHI and counsel the individual involved and attempt to rectify the situation. If at

10

least 30 days have passed and MCGHI is still dissatisfied, then MCGHI may remove and replace such person in accordance with the procedures for appointment set forth above. If MCGHI feels that the problem involved is having a detrimental impact on patient care, is causing a threat to the safety of patients, or is damaging the reputation or standing of the Hospital then it shall so notify PPG, in which case the foregoing procedures shall be dispensed with and the person may be removed by MCGHI immediately.

With regard to both doctors, the trial court reasoned that they were *not* acting within the scope of their official duties while acting in their capacities as medical directors at the Medical College of Georgia, based upon this court's intervening decision in *Jones v. Allen*, 312 Ga. App. 762, 762-766 91) (720 SE2d 1) (2011), reversed by, *Shekhawat v. Jones*, ___ Ga. ___ (Case No. S12G0552, decided July 11, 2013). The trial court concluded:

> The Court of Appeals has made it quite clear in the *Jones* case that a Board of Regents employed physician's official duties as the Medical College of Georgia stem from obligations as a faculty member of the medical college. . . . Because [defendants have] not shown that [their] position[s] as the Medical Director . . . correspond[] with [their] official duties as a faculty member of the Medical College of Georgia[, they] are not entitled to official immunity under the Georgia Tort Claims Act.

11

In their appeals, both doctors contend that the trial court erred by interpreting *Jones*, supra, to mandate a finding against immunity. The plaintiff asserts that we should affirm based upon *Jones*, supra, as well as the Supreme Court of Georgia's decision in *Keenan v. Plouffe*, 267 Ga. 791 (482 SE2d 253) (1997). Based upon the Supreme Court's recent overruling of its decision in *Keenan*, and the reversal of this court's decision in *Jones*, we reverse. *Shekhawat*, supra.

In *Shekhawat*, the Supreme Court concluded that the analysis of whether a physician is entitled to official immunity under the Georgia Tort Claims Act "shall proceed exclusively on the basis of whether the physician was acting within the scope of his state employment in performing the treatment that is the subject of the malpractice action." Slip. Op. at 12. In this case, as in *Shekhawat*, the issue is "easily resolved" because this case involves identical affiliation agreements and it is clear from the record that Dr. Cook and Dr. Wynn were full-time faculty members at MCG who "were performing the regular duties of their employment, during their regular hours of employment, at their regular site of employment." Id. They were therefore entitled to official immunity and we must therefore reverse the trial court's denial of Dr. Cook's motion to dismiss in Case No. A13A0601 and the denial of Dr. Wynn's motion for summary judgement in Case No. AA13A0602.

12

*Judgments reversed. Doyle, P. J., and McFadden, J., concur.*